Hope & Co. vs. Board of Liquidation.

## No. 10,830.

HOPE & CO. VS. THE BOARD OF LIQUIDATION.

1. The limit of the bonded indebtedness of the State is not exceeded by funding the balance due plaintiff.

(a) The bonds and Auditor's warrants preceding in date the 1st day of January 1874, are fundable under Act No. 3 of the Legislature that year, but not coupons, or warrants representing coupons.

(b) Although the funding be made subsequent to the 1st day of January, 1874, it is made as of date; and has the same legal effect as if made at said time. The bonds and coupons issued bear that date.

(c) Securities pledged as a protection to the State are not to be considered as of the date for settlement.

2. A large amount of these securities has been collected, and the amounts not yet collected are applied to the payment of plaintiffs, in accordance with the agreements made.

3. The greater amounts collected on these securities have been forwarded to plaintiffs, but have not been carried by plaintiffs in satisfaction of any particular claim.

(a) These and all securities are applied to the payment of the debts the State has the most interest in paying.

4. At the time that the amount collected was imputable, and at the present, the State's interest was, and is now, to pay its consolidated bonds and coupons.

(a) These creditors have subordinated their claims, not fundable, to the funded debt, which will be due them if the funding be made.

5. In 1836, to obtain the State's name to the bonds, all the securities pledged under Act of 1833, to Hope & Co., were pledged to the State, with the consent of their creditors, as a protection to the State.

6. Having been thus pledged, the character of the pledge can not be changed or made more onerous, by applying any of these securities to the payment of the Citizens Bank bonds, issued prior to 1836.

7. An agreement having been made, whereby the cash department retained $500,-000 of mortgage stock, which should have been applied to the payment of plaintiffs' claim.

The set-off sought to be made is not legal, and can not be invoked against the State's interest.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

Henry Denis for Plaintiffs and Appellants:

1. The test of the fundability of State bonds, under the funding law, is that they were issued in conformity to law, not in violation of either the State or Federal Constitution, and for a valid consideration. 31 An. 46; 40 An. 379.

2. The bonds, issued by the State in aid of the property banks, are fundable under the terms of the funding law. 30 An. 611; 30 An. 1151; 34 An. 770.

3. Doctrine of estoppel applies to the State in the same manner that it applies to individuals. 42 An. 1007; 41 An. 896; 34 An. 359; 28 An. 462; 28 An. 122.

4. A surety is only discharged to the extent that the release of the principal debtor has caused an injury to the surety. 11 An. 179; 13 An. 57; 16 An. 357; 29 An. 844; 42 An. 266; Laurent, Vol. 28, Sec. 306; Troplong, Cautionment, Sec. 527.

### Farrar, Jonas & Kruttschnitt on the same side:

1. The facts as to amount due by the State set forth, and the question as to imputation of amounts paid to plaintiffs by the Citizens Bank, since 1880, fully discussed.

2. The bonds sued on are valid debts of the State.

(a) That the furnishing of banking facilities to the public is a governmental function, is a principle which has gone unchallenged from time immemorial, and which is not denied in the case of Loan Association vs. Topeka. McCullogh vs. Bank of Maryland, 4 Wheat. 316; Briscoe vs. Bank of Kentucky, 11 Pet-257; Craig vs. Missouri, 4 Pet. 431; Curran vs. Arkansas, 15 How. 304; Darington· vs. Bank of Alabama, 13 How. 12.

(b) The State has successfully pleaded the validity of these bonds, and her indebtedness upon them, as a shield and a defense against a large mass of indebtedness sought to be imposed on her. State ex rel. Salomon & Simpson vs Graham, Auditor, 23 An. 402; State vs. Clinton, 28 An. 393.

(c) She is, therefore, estopped from now pleading their invalidity, or from denying her indebtedness upon them. State vs. Taylor, 28 An. 460; State vs. Ober-34 An. 359; 41 An. 896; 42 An. 1007.

3. The Legislature is presumed to be acquainted with the construction which has been put upon a statute, or on a given set of words, by the courts; and a statute, passed after a decision construing certain words, is presumed to be passed with reference to such decision, which, for all practical purposes, may be considered as written into and incorporated in the statute. Endlich on Interpretation of Statutes, Secs. 182, 367; Sutherland on Statutory Construction, Sec. 287. The Legislature, when it passed the funding act of 1874, knew that the courts had decided that the bonds sued on were part of the State debt, and therefore clearly included them in the words " all valid outstanding bonds," used in Act 3 of 1874, and the bonds sued on are, therefore, clearly fundable.

4. The total value of assets of the banking department of the Citizens Bank is only $300,000, If, then, the agreement of 1880, between the bank and the plaintiffs, released any legal right which plaintiffs then had, it released nothing except assets of the value of $300,000. This latter figure is the extreme limit to the amount of debt from which the State, if she could be viewed as a surety would be relieved, on account of the agreement of 1880.

### Thos. J. Semmes on the same side:

1. Where the creditor agrees not to sue the principal debtor, with reservation of rights against the surety, especially where the agreement contains a clause that it shall not be construed as impairing the claims of the creditor against the surety, and that said claims shall be preserved in all their integrity, such agreement does not aggravate the position of the surety, nor does it disentitle him, if he pays the debt, to sue the principal debtor, and therefore the surety is not discharged by such an agreement. 70 New York, 546; 73 Id. 217; L. R. 2 Scotch App. 457; L. R. 7 Eq. 21; L. R. 7 C. P. 14; 114 Mass. 120; 28 Laurent, No. 238; Dalloz, 1868, 2, 224.

Hope & Co. vs. Board of Liquidation.

2. The banking department of the Citizens Bank is a new creation, under the Act of 28th of April, 1853, and the compact of 26th July, 1853; the act of the Legislature of 1853, and the compact, are a new charter, by virtue of which the banking department was not liable for the antecedent debts of the bank. Pollock's Case, 12 An. 228. The compact was ratified and recognized as valid by the act of the General Assembly approved 17th March, 1858.

3. The surety who takes possession of the property of his principal, to pay the creditor, becomes the principal debtor, and loses the character of surety. Brandt Suretyship, Sec. 302; 25 Ohio St., 667; 25 Vermont, 484; 4 Ala. 223.

W. H. Rogers, Attorney General, and Carleton Hunt, for Defendant and Appellant:

Where parties holding bonds seek the benefit of the funding act of the State (Act 3 of 1874), they must take the disadvantages with the benefits, and payments on the bonds received subsequent to the act in question must be duly credited.

The obligation of the State on plaintiffs' bonds is that of surety only. The discharge of October 8, 1880, by plaintiffs releasing the Citizens Bank, necessarily operated the discharge of the surety State.

The Citizens Bank is one legal or juridicial person, and the stock mortgage depart ment and banking departments are only different departments of one and the same bank.

State ex rel. New Orleans Pacific Railroad vs. Nicholls, Governor, 30 An. 983, is affirmed by Adams & Co. vs. Board of Liquidation, 39 An. 68; Lessassier & Binder vs. Board of Liquidation, 30 An. 611, and Forstall vs. Board of Liquidation, 30 An. 1151, are not inconsistent with the Nicholls and the Adams cases. The questions presented in the Nicholls and Adams cases were not raised or presented in Lessassier & Binder vs. Board of Liquidation, and Forstall vs. Board of Liquidation, and were consequently not passed upon by the court. Nor are the bonds proceeded on in the two cases last named the same with those herein proceeded upon, nor do they import the same liability with those herein proceeded upon on the part of the State.

Bonds may be valid, but not fundable. Whether they are fundable or not, is a question depending upon the true construction of the funding act, Act 3 of 1874. According to the construction of that act, in State ex rel. New Orleans Pacific Railroad vs. Nicholls, Governor, and in Adams vs. Board of Liquida tion, plaintiffs' bonds are not fundable.

The opinion of the court was delivered by

BREAUX, J.    Hope & Co., a commercial firm, doing business in the city of Amsterdam, in the Netherlands, have brought suit to compel the funding, by the State Board of Liquidation, of *nine thousand and forty-two bonds*, each for the sum of *four hundred and forty-four dollars and forty-four cents*, dated the 1st day of February, 1836, and payable by series, respectively, on the 1st day of February, 1850, 1st

day of February, 1859, 1st day of February, 1868, 1st day of February, 1877, and the 1st day of February, 1886, which aggregate *four million eighteen thousand six hundred and twenty-six dollars and forty-eight cents;* the payment of these bonds was extended, and by agreement the series mature respectively on the 1st day of February, 1901, the 1st day of February, 1902, the 1st day of February, 1909, and the 1st of February, 1911.

They pray to fund the coupons of the bonds remaining unpaid, also for an order to the Board to issue and deliver to them in exchange consolidated bonds of the State of Louisiana, to the amount of *two millions four hundred and eleven thousand one hundred and seventy-five dollars and eighty-eight cents,* bearing date the 1st of January, 1874, with all coupons from 1874 annexed, except the coupon due the 1st day of January, 1880, and with the interest coupons on said bonds reduced to 2 *per cent.* for five years from January 1, 1880, and to 4 *per cent.* thereafter.

The Board of Liquidation deny that these bonds are fundable, and that they are included in the terms of the act of the Legislature, approved January 24, 1874, and they aver that they can not be funded.

They have offered evidence to prove that the amount in contemplation at the time, to be funded, exceeded the limitation imposed by that act without including plaintiffs' claim. They aver that the bonds were issued in aid of the Citizens Bank for its accommodation, and that the State bound itself as security for their payment; that they were issued by the bank, and indorsed by it in such form as to make it the principal debtor.

They allege that plaintiffs, the bondholders, had knowledge of the acts of the Legislature authorizing the indorsement, as it was made. That they dealt and treated with the bank, as principal, for many years, and as such received from it large sums of money on account of the principal and interest due on said bonds.

They, in their answer, further plead, that, on the 8th day of October, 1880, without the knowledge or consent of the State of Louisiana, the plaintiffs entered into an agreement with their debtor, the Citizens Bank, by which they discharged said bank for and in consideration of certain things to be done. That the bondholders reserved their rights only upon the mortgages granted by the shareholders to secure their stock and upon the property acquired in foreclosure proceedings.

That by this discharge the State is released from all liability.

There was a judgment in favor of defendant, rejecting plaintiffs' demand.

The following are the agreed facts in the case:

The total amount of the bonds issued under Act of 1836 was $7,000,000. In October, 1880, the indebtedness on the bonds had been considerably reduced; at which time an agreement was entered into between the bondholders and the Citizens Bank. This agreement shows that on January 1, 1874, the following amount was outstanding, to-wit: $4,018,626.48, represented by bonds.

These bonds were issued by the State in aid of the bank.

They had coupons attached, of interest, signed by the bank, through its cashier.

On these coupons the bank defaulted.

Interest warrants for the amount of the past due coupons, including interest on the amount computed to the maturity of the warrants, were issued, signed by the Citizens Bank.

Subsequently, the bank again defaulted in the payment of interest; payment was again extended by agreement between it and Hope & Co. Interest warrants were again issued by the bank for past due coupons, with interest computed to the maturity of the warrants.

These warrants represent the sum of $921,129.26.

\*      \*      \*      \*      \*      \*      \*      \*

With reference to these warrants, plaintiffs' counsel, in one of their briefs, admit "that [plaintiffs'] coupons represented in such warrants were not fundable, is clear from the face of the funding legislation, which nowhere provides for funding of coupons."

We copy this admission for the reason that it accords with our view of the statute, from which we extract the following: Consols "shall be exchanged for all valid outstanding bonds of the State, and all valid warrants drawn previous to the passage of the act by the Auditor on the Treasurer."

These warrants are not drawn by the Auditor, and they are for past due coupons, for the funding of which Act 3 of 1874 does not provide.

\*      \*      \*      \*      \*      \*      \*      \*

There is due by the bank the sum of $133,333.33, which plaintiffs desire to have funded.

There is in possession of plaintiffs, or of their debtor, the bank, who holds for them, a large amount of mortgage stock assets of the Citizens Bank, consisting of stock mortgages, given under the Act of 1836, on the property of the shareholders of the bank, to secure their stock subscription; property which the bank has been unable to sell, acquired under foreclosure of stock mortgages; mortgages not collected given for mortgage stock; property acquired by the bank under such foreclosure, and afterward sold by the bank, and amounts due by shareholders on their stock subscriptions; the value of these assets were fixed at about $800,000; by agreement between the parties to this suit, they are "applicable to the payment of the bonds." Vide compromise of 1880.

There is, besides, cash on hand, in the Citizens Bank, the sum of $85,000 " to be remitted to the bondholders."

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

At different dates, from January 26, 1881, to December 24, 1890, there was remitted by the bank to plaintiffs $2,060,466.35. On October 8, 1880, the Citizens Bank owned assets to the amount of $1,500,000, representing the capital contributed by the cash stockholders under Act 246 of 1853, and $500,000 of mortgage stock assets of actual value not exceeding $300,000, set aside for the alleged advances of what is termed the banking department to the stock mortgage department.

The cash stockholders made another contribution to the bank, in 1883, of $350,000. The assets and property of the bank representing the capital furnished by those termed its cash stockholders, i. e., the assets of the banking department proper, amounted in value on the 1st of January, 1889, to the sum of $300,000.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Having made a statement of these amounts, we will consider questions relative to the bonds held by plaintiffs.

They are not made in the ordinary form of a bond, to the order of the bank, and by the latter only indorsed.

On the face of the bond reference is made to the endorsement, and in the endorsement special promise to pay is made, more direct and binding than are conditions of endorsements on negotiable paper in the ordinary course of commerce.

The State promises to pay to the president and directors of the bank the amount of the bonds with interest, at the rate of 5 *per cent.*

*per annum*, payable half yearly, at the place and in the current money named in the endorsement.

There is an extension of time endorsed on each bond, and in addition, the bank obligates itself to reimburse the principal to the plaintiff at the place named, also to pay the interest half yearly.

The transactions are not of recent origin.

The original scheme bears the date of the bank's original charter; for the bonds bear the impress of the act of 1833.

In accordance with its terms subscription to stock was received. The stock was secured by mortgages, which were to be security for loans.

It was prohibited to issue bonds before mortgages were executed to an amount exceeding the sum of bonds issued by one-fifth.

The *pact de non alienando*, was made by law a stipulation in every act.

The husband and the wife were authorized to contract and obligate themselves jointly and *in solido*.

The bank was not subject to insolvency laws; *i. e.*, the insolvency proceedings on the part of its debtors did not affect its interest.

It was also exempt from the payment of taxes.

But this act did not offer sufficient security.

Only one hundred and thirty-three thousand three hundred and thirty-three dollars and thirty-three cents were borrowed ($133,-333.33).

      *     *     *     *     *     *     *     *

To aid the bank, in 1836, another act was passed amending the charter.

The faith of the State was pledged for the security of the loan.

Bonds were issued by the State to the order of the bank.

The form of the bond was prescribed in the act, and it was provided, for the guarantee of the bond, to be emitted by the State, in favor of the bank, that all the securities granted by the act of incorporation—

"Are transferred to the State and the holders of the bonds."

These securities (the mortgages executed as security for stock) given by the stockholders were to remain a perpetual pledge, as contemplated in the original act of incorporation.

As inviting conditions, the State was to receive a fractional portion of the profits, and to have an open credit of $500,000. No

profits were ever realized, nor do we know that the credit before stated, of $500,000, has ever proved useful to the State, or of the least avail.

\*   \*   \*   \*   \*   \*   \*   \*

In 1842 the bank's financial condition was not satisfactory. In six years, a moment in the history of a State, the bank was in a condition of insolvency. Large amounts had been mismanaged.

To prevent waste and expensive litigation, the State took sufficient charge to secure better management. To this end, managers were appointed on the part of the State, and the responsibility of the in-corporators toward the creditors was protected. Interests were paid during the time the State had supervisory control, and amounts realized, while under the preceding administration, of the share-holders, the bank had defaulted in the payment of interest.

The legislation with reference to this bank, from 1842 to 1853, was in the direction of the State retaining possession of the assets of the bank until the final payment of all State bonds issued for its benefit.

The act approved April 6, 1847, at a time when the State had supervisory control, through managers of her selection, *inter alia*, provides for the payment of interest upon the bonds of the State issued for account of the bank.

In 1852, by an act of the Legislature, it was proposed, on certain conditions, to relieve the bank from the decree of forfeiture, rendered against it in 1842, and to reinstate its administration and restore the management to the stockholders, with all rights and privi-leges existing before the forfeiture.

" To the same extent with the same restrictions as if the decree of forfeiture had never been rendered." · Bank Act of 1852, No. 141.

The conditions were not complied with.

In 1853 new arrangement was made, and the bank resumed abso-lute control.

At the time great interest was felt in the affairs of the property banks.

It is historical that they gave occasion to issues which agitated the public mind. Parties divided, and questions of closing and the necessity of discontinuing their business were energetically and sharply presented throughout the State.

Their indebtedness was the subject of comments, debates and correspondence.

The pledge and aid of the State were not unanimously given. In the halls of the General Assembly the debates were anything but harmonious when legislation affecting these banks was under consideration.

It is not difficult at times to discover imperfect grants and privileges. ·An active minority has left the impress of its opposition, and has prevented legislation of a satisfactory character.

The laws passed with reference to these banks must have been well known to their respective creditors.

    \*      \*      \*      \*      \*      \*      \*      \*

In 1853, Act 246 authorized the Citizens Bank to convert shares secured by mortgage into cash shares to the amount of one *million* dollars, by obtaining in cash the payment of 10,000 shares composing the capital stock, and to that end the directors were given the right to set apart a portion of the stock held by each stockholder, not exceeding one in fifteen.

These shares, together with such proportion of the stock held by the bank, as made up the ten thousand shares, were limited to one million in amount, to be paid in full at the time and in the manner determined by the board, in order to constitute a cash department.

The mortgages against the stockholders holding these shares were to continue as they were before the adoption of the act.

The owners of these shares were to divide and receive profits. They were also to share in the losses.

The 10,000 shares of the cash department, set apart, were still subject to contribution as part of the original stock of the bank, secured by mortgages; they were designated as and had the right and quality of cash stock, instead of mortgage stock, but the former liability to contribute was unimpaired.

The inducements offered to the stockholders, to pay the full amount in cash of this stock, were a share in the profits of the bank, in the proportion of the amount of stock paid up, to the amount of available banking assets of the bank, to be estimated and fixed by the board of directors, and on such terms and conditions as shall be directed by said loan.

The act creating this cash department of the bank provided that it should only be enforceable, after having been accepted, by a majority in number and amount of the stockholders of the Citizens Bank.

It was accepted by the required number, and as between these shareholders, *i. e.*, the cash and the stock mortgage shareholders, a change was made in the constitution of the bank. There is no doubt that the mortgage stockholders and the cash stockholders were bound by the act of the majority. Pollock vs. Citizens Bank, 12 An. 230.

But how as to the creditors who took no part and were not consulted? They were not in any respect bound.

\* \* \* \* \* \* \* \*

Act 40, of 1874, authorized the bank to extend the payment of the bonds, and it was extended.

\* \* \* \* \* \* \* \*

Act 79, of 1880, authorized the bank to make compromises, and settle the liability of the mortgage stockholders arising out of the stock mortgages granted by them to secure their subscriptions, and ordered that all sums realized under the compromise, and from foreclosure of mortgages, be applied, by the banking department, to the satisfaction of the bonds of the State, issued in aid of the bank, and to the legal liabilities of the mortgage department.

The bondholders consented to the liquidation on the terms proposed.

An inventory was made of the assets of the mortgage department subject to the payment of the debt.

We are not informed of the amount nor of the character of all those securities to be appropriated to the payment of the debt, under the acts of the General Assembly and the terms of the compromise.

The plaintiffs stipulated that no sale would be made by the Citizens Bank, no compromise or settlement whereby their security would be diminished, nor any discharge granted without full payment to them.

We copy the following, as it contains the declaration that " these parties consent to the fulfillment of the objects of the Acts of the General Assembly, approved 9th April, 1880, because the same was designed to release the State and the bank, and because the liquidation of the mortgage stock department, and the application of the sums to arise from such liquidation to the payment of the bonds and interest thereon seem to be demanded under the conditions which exist."

In consideration of certain engagements of the banking depart-

ment, Hope & Co. bind themselves never to claim or demand any payment of the bonds from it as a debtor.

The indebtedness of the State, to the bank, was fixed by the latter with Hope & Co.

By a cursory reading of the act of compromise, it will be seen that the parties did not limit themselves to the terms and requirements of the law approved 9th of April, 1880.

They declared that they have an immediate interest in all the securities granted by the bank.

They obtained statements of the securities to be applied by them to the payment of the debt.

They released the cash department.

They consented to a "set off" of an interest of $500,000 against a claim said to be due by the mortgage department to the bank.

They declared that they have an immediate interest in all the securities of the bank and provided for the application of the amounts realized.

\*        \*        \*        \*        \*        \*        \*        \*

With reference to the funding of the bonds:

The funding law has for object the consolidating and reducing the floating and bonded debt of the State.

The bonds were to be exchanged by the Board of Liquidation for all valid outstanding bonds of the State and all valid warrants issued.

This funding is subordinated to the condition that the limitation of the indebtedness of the State should be observed and not exceeded.

It remains for our determination, whether the total of the claims plaintiffs have a right to fund exceeds the limitation.

The question is not *res nova*.

We will revert to the different decisions, *in pari materiae*.

The case of Solomon vs. Graham, 23 An. 402, decides that these bonds are a part of the indebtedness of the State, in summing the total of $25,000,000 as her indebtedness.

This decision was rendered in 1871.

It is argued by the defendant that the State's debt was $24,283,-886 in January, 1874, as found in the case of State ex rel. New Orleans Pacific Railroad Company vs. Nicholls, Governor, 30 An. 982, and that it was impossible for plaintiffs' amount to have entered into the plan, for in funding it with other liabilities, it will produce a sum total exceeding that fixed by the act and the amendment to the Constitution.

Prior to this decision, bonds of the Consolidated Association of the Planters of Louisiana were funded in obedience to decrees of this court. Lessassièr & Binder vs. Board of L., 30 An. 613; 30 An. 1151; 34 An. 770.

The question of the limitation of the State debt is not shown by the decisions to have been expressly considered, but the fact remains that in each case the funding of the bonds was ordered.

The limitation has not been reached, for the bonded indebtedness is $11,279,780.66.

*     *     *     *     *     *     *     *

These bonds were originally fundable.

But it is argued that plaintiffs have, by their own acts, precluded themselves from the offer of the statute to bond.

We have not reached that conclusion. The plaintiffs have kept their claims alive and have extended their payment with the State's consent.

Had the funding taken place in 1874, the mortgage securities held by them would have been chargeable, as they are now.

With legislative consent, the plaintiffs retained these securities and made collections. *Vide*, act approved April 9, 1880.

They account for the cash received on the mortgage securities, and which are to be applied as they would have been in 1874.

The plaintiffs had the right to fund in 1874.

The time within which to fund is not limited in the act.

Prescription is not pleadable against the right to fund, nor the time that has elapsed.

The bonds were issued in conformity to law.

They were not issued in violation of the Constitution of the State, or of the Constitution of the United States.

They were issued for a valid consideration.

Having the just stated essentials, they are fundable.

The delay is as much of the State as of Hope & Co.

It is stated that the settlement, from the necessity of imputing payment, is exceedingly difficult, if not impossible.

It is admitted by all parties that prior to funding, the balance due by the State must be established. The evidence is all before the court. It only remains to calculate the interest and to deduct the credit to which the State has a right.

The defendants argue, with great earnestness, that the plaintiffs have been paid; that the large amount remitted to and received by them must be credited on the bond, also the uncollected assets, and the $85,000 in bank. [This will receive further attention hereafter in our decision.]

It is admitted that the coupons and the interest warrants are not fundable.

*    *    *    *    *    *    *    *

Plaintiffs, assuming that there is absolute similarity between the obligation on the bonds issued by the Consolidated Association of Planters of Louisiana, and those held by them, the decisions rendered affecting the latter are quoted as applying to the former.

The similarity is not complete. The bonds are not entirely similar, at any rate in so far as relates to the indorsement.

The indorsement of the Citizens Bank bonds was made with reference to the responsibility of the bank, and binds it to pay principal and interest. The special indorsement on the bonds of the Association of Planters is limited to interest.

But this is not the only difference; that just mentioned is of minor importance.

There is a special admission by plaintiffs "that the bonds were issued by the State of Louisiana in aid of the Citizens Bank, under Act of January 30, 1836."

Thus making part of, and reading into, the contract that "the faith of the State is hereby pledged for the security of the said sum." Act of January 30, 1836.

In the act in aid of the Consolidated Association of the Planters of Louisiana, "the faith of the State was pledged for the reimbursement of the capital," and their bonds were made accordingly.

The holders of the last bonds did not enter into transactions and compromise, and did not make admissions virtually embodying the statute in the contract.

The State never was called upon for the payment of these bonds.

No appropriation was made to pay these bonds, nor has there ever been, at any time previously, in legislative proceedings, any statement made of a principal obligation.

*    *    *    *    *    *    *    *

With reference to interest which, by time and by calculating in-

terest upon interest, without authority from the State, has increased to a large amount:

If this had been a strictly principal obligation, on the part of the State, there would not have been the least right, on the part of the security, to calculate interest on interest; to make settlements; fix amount of the indebtedness, and issue warrants covering unpaid coupons. These are acts of a principal, not of a surety.

The authority of the bank to compute interest, as was done, is not at issue, and therefore there is no necessity of discussing its legality and binding effect. It is only mentioned as an evidence of the individual settlement made by the bank with Hope & Co.

The plaintiffs, by those transactions and the compromise made, carried out the express terms of the statute of 1836, "that both the capital and interest of said bonds shall be paid by the bank, at the time they shall become due."

It is not out of place to now mention that the provisions of the act in this respect was carried out in the indorsement.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

It is contended by plaintiffs that the State, in exacting, in 1842, better management on the part of the bank, assumed thereby the responsibility of a principal.

That the surety who takes possession of the property of his principal to pay the creditor, becomes the principal debtor.

The bank's assets remained under the State's supervisory control from 1842 to 1853 (not to the present time, as stated by counsel).

The bank's condition, at the time, made this control necessary.

The State only enforced its laws relative to insolvent banks.

It was an act of administration which the court, at that time, characterized as conservative and proper.

The Citizens Bank has been in possession of all its assets all these years.

Plaintiffs are its correspondents.

They have transacted with it and have made important agreements. They are estopped from alleging that the State is in possession of the bank's assets.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

The amount of the State's responsibility must be determined.

In the act of compromise of 1880, plaintiffs assumed that the State had released the cash department. In this there was error.

She only granted certain rights and privileges to certain share-holders.

Acting upon, this erroneous assumption, plaintiffs consented never to sue for, nor recover, any sum from the bank on its indorsement or on account of the bonds, other than that realized from the mortgage department.

The plaintiffs have elected to be paid from the amounts realized, and to be realized, by the mortgage department. They consented in 1880 to transfer the $500,000 of mortgage stock assets of actual value, not exceeding $300,000, to the cash banking department.

This amount should have been applied to the payment of plaintiffs' bonds. By their instrumentality it was not paid.

The plaintiffs and the bank applied to another purpose an amount which should have been applied to the release *pro tanto* of the State's obligation. The bank itself was released from accounting for or paying any but the amounts realized from the mortgage stock department. Both these values were fixed at $300,000.

To the extent of the release and the loss to the State, the plaintiffs should be charged.

It is contended that the bank department advanced $682,430.61, which stood as an offset, at the time of the compromise and by its terms.

Keeping due account of the bank's responsibility to its cash share-holders, there remains a release and consequent discharge at least equal to the $300,000. To that amount the State has a right to credit. The debits and credits of neither department could be changed, so as to result in $500,000 stock mortgage being applied to any purpose other than that agreed upon.

To the extent of the change made to the State's loss credit must be given. 11 An. 179; 13 An. 57; 16 An. 357; 29 An. 844; 42 An. 266; Laurent, Vol. 28, Sec. 306; Troplong, *verbo* Cautionment, Sec. 527.

\*  \*  \*  \*  \*  \*  \*  \*

An admission is made with reference to the assets now in bank, viz., $800,000 in securities and $85,000 cash, which binds all parties, viz., " that there is still on hand applicable to the payment of the aforesaid bonds," and " that the value of said assets and property applicable to the payment of said bonds is about $800,000." This includes the mortgage securities.

The plaintiffs not only asssumed the control, but the ownership of these assets.

The cash, $85,000, should be at once remitted.

Relative to these assets, it is admitted that there is still on hand applicable to the payment of the aforesaid bonds " a large amount of mortgage stock," etc. These should also be charged.

It is argued, by plaintiffs' counsel, that the indebtedness of the State has not yet matured on the bonds, and that, in consequence, the amount in plaintiffs' possession should not be applied to their payment, except the balance, after the matured debts will have been paid.

In electing to avail themselves of the offer to fund, their claims have been made to mature.

The exchanges of old bonds for the new can be made only on the basis of matured claims.

The plaintiffs, by granting time for payment, which they now wish to revoke, can not thereby be placed in better position than if no time had been given.

The Board of Liquidation can only be concerned about the claims to be funded.

They can require proper credits to be made on the claims offered, otherwise they would be placed in the position of having to fund claims regardless of payments made.

They can not apply the amounts received to other bonds or claims than those offered to be funded.

These assets can not be retained or applied to the payment of debts other than those for which they are held.

\*  \*  \*  \*  \*  \*  \*  \*

In the articles of compromise of 1880, the amount of $133,333.33 figures as an item of indebtedness of the State.

That amount can not be charged against the State. The State is not obligated to its payment.|

For the guarantee of the bonds remitted by the State, all the securities granted by the act of incorporation of the bank are transferred to the State and the holders of the bonds.

This amount was due when the State loaned its credit, and is, therefore, not included in the second amount, i. e., the amount for which the State became bound.

The State loaned its name for the payment of all sums loaned

48

under the act of 1836, provided all stock mortgages issued were held for its protection. This excludes an amount loaned prior to the pledge of these securities to the State. The pledge of the securities and the rights of the State in this respect were fixed and upheld.

\* \* \* \* \* \* \* \*

The warrants for extended coupons can not be funded under the statute, nor should part of the amount in plaintiffs' hands, not applied, be imputed to their payment.

To all intent and purposes the funding shall be made as if the parties had presented themselves in 1874 to fund their claims.

The State did not have at the time the needful cash for payment. A large sum was realized years afterward.

Owing to plaintiffs' act in applying to fund, they placed the funded indebtedness on a better basis for collection than the other (the claims not fundable).

. The payment should be imputed to the debt which the debtor had at the time of payment most interest in discharging. C. C. 2165.

During the eighties, when the remittances were made, the State had the most interest in discharging the consols and the coupons accompanying.

We recapitulate as follows:

Capital, January 1, 1874, $2,411,175.88; interest thereon, to be calculated from said date to January 1, 1880, less interest coupons due 1st of January, 1880, at 7 per cent.; from last mentioned date, interest to be calculated at 2 per cent. to January, 1885; and from that date at 4 per cent.

Three hundred thousand are credited.

The bonds and the interest thereon are subject to other credits, aggregating $2,060,466.35, remitted at different dates, from January 25, 1881, to December 25, 1890. R., pages 81, 82, 83 and 84.

Another credit of $885,000, from date of funding.

Under this view of the case, the claim should be settled on the following basis: Plaintiffs should be credited with the total amount of the consolidated bonds which they would have received for their bonds on January 1, 1874, being $2,411,175.88, in principal, and the interest thereon, according to the terms of the bonds and the law, calculated up to the date of actual funding.

Against this they should be charged with the following debts, viz.:

1. With the total amount of cash collected by them, $2,060,466.35,

with legal interest calculated thereon from date of each payment to the day of funding.

2. With the $300,000 (applied differently, by compromise of April 8, 1880, from the requirement of statutes and terms of agreements made).

3. With the $85,000 cash on hand in the bank; and—

4. With the eight hundred thousand dollars ($800,000) values of the securities remaining, as admitted by the parties.

When a balance is struck between these credits and debits, this balance will be the amount for which the Board of Liquidation should issue to plaintiffs' consolidated bonds, with all coupons for interest prior to date of funding cut off and cancelled upon the surrender to the State by plaintiffs of the bonds held by them. It is, therefore, ordered, adjudged and decreed, that the judgment appealed from be annulled, avoided and reversed, and it is now ordered, adjudged and decreed, that the Board of Liquidation be ordered to settle and liquidate the claim of plaintiffs in accordance with the foregoing statement, and, on surrender of the bonds presented and held by plaintiffs, to issue to them consolidated bonds for the resulting balance, without the coupons attached thereto prior to date of funding, which shall be cut off and cancelled; and that on the issuance of said bonds to the plaintiffs, the State be subrogated to the rights of the plaintiffs of whatever nature against the Citizens Bank.

Appellees to pay costs of both courts.

## CONCURRING OPINION.

WATKINS, J. Claiming to be the holder of bonds of the State, aggregating in capital the sum of $4,018,626.48, the plaintiffs' demand and prayer are that same be funded, and exchanged for consolidated bonds of the State of Louisiana, for the amount of $2,411,-175.88, bearing date January 1, 1874, with all coupons thereto annexed from 1874, except the coupon due January 1st, 1880, which is annulled, and with the interest on said bonds reduced to 2 per cent. per annum for five years, from the 1st of January, 1881, and 4 per cent. per annum thereafter.

It is averred that these bonds were issued and subscribed under an act of the Legislature of date January 30, 1836, relative to the Citizens Bank, payable in series maturing on February 1, 1850, 1859, 1868, 1877 and 1886, and that same were renewed under

legislative authority, and the respective maturities thereof extended to 1901, 1902, 1909 and 1911.

While the bonds mentioned are those familiarly known and designated as Citizens Bank bonds, and are signed by the Governor of the State, and countersigned by the Treasurer, yet the Citizens Bank is not made a party defendant; and, for this reason, I fail to understand why certain counsel of the plaintiff have introduced into the discussion the series of bonds for the aggregate sum of $133,333.33, which were issued by the Citizens Bank under the authority of its legislative charter, of date April 1, 1833, and for which the *State is in no way bound.* It can not certainly be contended that they are valid obligations of the State, and that the plaintiff is entitled to fund them; and certainly the funding laws have no reference to any other bonds or obligations than 'such as the State is under *contract* to pay.

The same may be said of the question of *interest;* for, whatever may be said of the fundable character of the bonds themselves, it is clear that plaintiffs have no claim against the State for *interest* on the bonds. In the first place, there is no demand contained in the brief of either counsel for any allowance on that score, in bonds.

One of plaintiffs' attorneys says, viz.:

"Upon which"—the principal of the bonds—"interest is alleged to be due and unpaid, from the year 1868 to date." But it will be ascertained by actual calculation, that the sum of $2,411,175.88, for which new consols are demanded, is just 60 cents on the dollar, of the *capital* of the bonds, $4,018,626.48, which plaintiffs claim to own and want to have funded.

This demand is in keeping with the form of decree that is appended to the brief of same counsel.

But the contemplated object of all this array of figures, and the discussion of interest computations, and imputation of payments, evidently was to consume *in interest* the sums that have been remitted by the Citizens Bank, and which are now in the possession of the plaintiffs, aggregating the large amount of $2,060,466.35 in cash, as well as the $885,000 of other values in the joint possession of the Citizens Bank and the plaintiffs; and, by this means, to obtain the *full sixty cents on the dollar of its bonds, with interest thereon from January 1, 1874.* The further object is, by combining in one calculation, these interest computations with the issue of $133,333.33 of

Citizens Bank bonds, above referred to, *to absorb all of the pledged assets* in the possession of the plaintiffs and of the Citizens Bank, and which *belong to the State.*

In confirmation of this, we need only refer to the brief of one of the counsel of plaintiffs (p. 10), in which this paragraph will be found, viz. :

"If we apply the above rule to the partial payments in this case, the result will be *to extinguish all of the interest warrants, all of the bank bonds, and leave a considerable sum to be imputed to the payment of the interest upon the consols to be issued to us, and which should,* of course, bear date January, 1874.

"The net result of the calculation will be, that the interest on the consols, to be issued to us, will be partly paid, and the State will hold a *lien upon the balance of the assets of the mortgage stock department of the Citizens Bank*   *   * to *pay that interest,*" etc.

This much having been premised, I will now examine the questions raised by the defendants, in brief, and apply them to this case.

They are as follows, viz. : (1) That the plaintiffs' bonds represent only a contingent, and not an absolute liability of the State, and were not contemplated or included in the funding scheme; (2) that the State only bound herself as surety on said bonds, and by the agreement of the 8th of October, 1880, between the plaintiffs and the Citizens Bank, she was discharged therefrom.

It was the second defense that the district judge sustained, and on that ground he rejected the plaintiffs' demand.

The initial point from which these questions should be considered and determined, is the date of their issuance, and the law under the authority of which same were issued. For, it is well settled, that an enabling act, under the authority of which bonds are issued, must be looked to as furnishing the *vinculum* of the contract, in so far as the State is concerned, and, likewise, any corporation deriving its rights thereto through a legislative enactment. Such legislative enactment is considered as having been read into the contract; and all persons contracting with such corporation on the faith of the obligations, or pledges of the State, are conclusively bound to know the extent of the authority conferred; for that is the *measure* of its authority to contract or bind the State to a third person.

This being the case, the law must be first consulted; for anything contained in the bonds, or in their indorsement, which are not in

keeping therewith, are not of binding force, so far as the State is con-.cerned.

I.

By act of April 1, 1833, the Citizens Bank was chartered and its capital stock was fixed at $12,000,000, to be procured by means of loans on a subscription of $14,000,000, to be secured by mortgages issued by the subscribers. Secs. 1, 2 and 3.

The *directors* were authorized to issue bonds of a prescribed form, for which the stock-mortgages were security, and said bonds were to be negotiated by the bank for the purpose of obtaining the necessary capital for banking operations. Sec. 4.

By this act the State was to have a standing credit of $500,000, " *to be loaned for such time as the State may require,* not exceeding the time granted to the stockholders, *on the bonds or obligations of said State being furnished* in such manner as may be provided by law, bearing interest at 5 per cent. per annum." Sec. 11.

It was under this act that the Citizens Bank emitted and negotiated the $133,333.33 with the plaintiffs, as stated above. It is manifest from what has been recited from the organization act, that the State is in no way bound therefor. She was not a partner, nor stockholder. She was entitled to a standing credit, but loans were to be made to her just as loans were to be made to stockholders, upon furnishing her bonds, or interest-bearing notes.

This scheme proved a failure, and it became necessary that some additional means should be devised to make it a success. Accordingly a supplemental act was passed by the Legislature, on the 30th of January, 1836, which was predicated upon *this* declaration, viz.:

" That, in order to facilitate the Citizens Bank * * * in the negotiation of the loan of $12,000,000," aforesaid, " *the faith of the State is hereby pledged for the security of said sum,*" etc. Sec. 1.

It then provides " that bonds for the sum of $3,000,000, with the privilege of $12,000,000, shall be subscribed to the order of the president and directors of the Citizens Bank, by the Governor, and countersigned by the Secretary of State and Treasurer."

It further specially authorized said bank to transfer said bonds by indorsement, and thereon to designate the place at which interest would be paid by the bank.

Then, in conclusion, it declares that the State shall have all the guarantees the Citizens Bank has, and " *that all the securities granted*

*by the act of incorporation of said bank*   \*   \*   *are hereby transferred to the State,"* etc.

When I consider that these bonds were issued to the Citizens Bank, with the sole object in view of facilitating the bank in negotiating a loan, as was proposed in the act of 1833, and for that purpose "the faith of the State was *pledged for the security of said sum:"* that, to guard against loss, the loan provided, specially, for the bank to negotiate the bonds by means of its *own* indorsement, in which it should be stated at what place it would make payment of interest: that, in the execution of this trust, the bank placed on the back of the bonds an indorsement of a peculiar character, containing the form and characteristics of a new and additional promise, viz.: 1. "For value received [we] do hereby endorse and transfer the within bond," (2) " and hereby bind the Citizens Bank of Louisiana to pay the said interest half-yearly,   \*   \*   in the city of Amsterdam, at the counting house of Messrs. Hope & Co.,   \*   \* upon presentation and delivery of *dividend warrants in the margin thereof,"* (3) " and, *also, do bind the said principal in Amsterdam, at the counting house of Messrs. Hope & Co.*   \*   \* upon presentation and delivery of this bond," etc.

When I consider further, that to these bonds are attached dividend warrants, or coupons, representing interest installments, which are signed by the cashier of the bank, and no other person; that there are attached to the bonds no interest coupons,—I feel constrained to believe that all of these recitals and facts are the clear and undisguised *insignia* of a new and independent contract between the plaintiffs and the bank, which had for its payment the faith of the State pledged as security. Notwithstanding the form of the bond was that of a prinicpal obligation, yet its effect was restrained and limited by the terms of the legislative act which authorized its execution, and it is fairly interpreted as such by the contemporaneous acts of the parties. Such an indorsement is not controlled by the *lex mercatoria,* but is such an indorsement as is usually employed in the assignment of choses in action, not debarring incipient equities between original and other antecedent parties to the instrument assigned. This is the exact situation of Hope & Co., in my conception; and the contract of the State binds her, simply and only, as surety of the Citizens Bank.

The act of March 16, 1827, which granted a charter to the Consoli-

dated Association of the Planters of Louisiana, and authorized it to organize with a capital of $2,000,000, to be raised by a loan on like mortgage subscription as the Citizens Bank was, and by its negotiation of similar bonds; and the act supplementary thereto, of February 19, 1828, whereby the capital of the association was increased to $2,500,000, and the issuance of a different series of bonds for that purpose, which was predicated upon *this* declaration, viz., "that in order to facilitate the Consolidated Association in the negotiation of the aforesaid loan of $2,500,000, *the faith of the State is hereby pledged for the reimbursement of the capital and interest* of said sum," can not be referred to as controlling the question raised here.

This series of bonds was quite similar in purport to those held by the plaintiff; but nothing appears in the record as to the terms of the indorsement to the holders thereof.

The relations between the Consolidated Association and the State were, "that the State shall be and is hereby acknowledged to be a *stockholder of the amount* of $1,000,000, as a *bonus;* on condition, however, that the *credit* to be granted the State, in consideration thereof, shall be $250,000 during the duration of the charter; and the State shall pay interest on the whole, as a part of its credit, as the case may be, whenever it shall make use of the same;" but one of the conditions required was that the *dividends arising from the stock should be paid into the State Treasury.*

It thus appears that the State was an *absolute stockholder* of the association, to the extent of two-fifths of its capital stock, and that her security was additionally provided for by the contemplated deposits of the association in her treasury. These were all the securities that she was supplied with; for there was no provision made in the law that the mortgage securities consented by *other* stockholders should, in any event, be transferred to the State as surety, as in the case of the Citizens Bank transaction.

All of these provisions point with unerring certainty to the obligation of the State as being that of a principal debtor; and so it has been repeatedly decided. Such is the plain and unmistakable meaning of the phrase, "that, in order to facilitate the Consolidated Association in the negotiation of the aforesaid loan of $2,500,000, *the faith of the State is hereby pledged for the reimbursement* of the capital and interest of said sum."

And that the obligation of the State to the Citizens Bank was that

of a surety, appears just as clearly, from the phrase, "that in order to facilitate the Citizens Bank * * * in the negotiation of the loan of $12,000,000, aforesaid, *the faith of the State is hereby pledged for the security of said sum,*" etc.

This was evidently the manner in which the plaintiff and the Citizens Bank considered this provision of the legislative act, as it appears that in its contract of endorsement of the bonds the *bank alone* bound itself "*to reimburse* the principal," as the State had done in the bonds of the Consolidated Association.

In the case of Forstall vs. Consolidated Association, 34 An. 770, the word "reimbursement" was interpreted by this court to mean the return of money, or the putting back of money taken from the purse of another who had disbursed it; and, speaking of the case then in hand, said the State was bound primarily; and, in case she had made payment, "the guarantee furnished to secure satisfaction of the obligation by reimbursement would have inured in her favor," etc.

Such an *obligation* is clearly and easily distinguishable from the mere "accessory promise" of the State quoted above.

For "securityship," says the Code, "is an accessory promise by which a person binds himself for another already bound, and agrees with the creditor to satisfy the obligation, if the debtor does not." R. C. C., 3035, 3045.

In the instant case, there was no consideration for the bonds, until the Hope Company loaned the Citizens Bank money on its contract of endorsement, and it was for the faithful performance of *its contract of reimbursement* that the faith of the State was pledged as surety.

In my opinion, it is quite clear that in this transaction the State sustained the rélation of surety to the Citizens Bank, and that her security for indemnification against loss was and is to be found in the mortgage securities that were transferred to her, under and in pursuance of the act of January, 1836.

## II.

On the second proposition much has been said in reference to the applicability of the funding laws to what is termed a contingent liability of the State, and some well considered and exceedingly persuasive decisions have been cited to that effect; but, in the pres-

ence of the clear and unmistakeable language of the funding statutes, I am unable to concur therein, after mature deliberation on the subject.

The provisions of the first act are, "that for the purpose of consolidating and reducing the floating and bonded debt of the State" there was created "a board of liquidation;" and it authorized said board to issue and give consolidated bonds in exchange "*for all valid outstanding bonds of the State,* and all valid warrants," etc. Sec. 1, Act 3 of 1874.

The object and purpose of the funding scheme is therein announced to be " to reduce and restrict the *whole indebtedness of the State* to a sum not exceeding $15,000,000, and to agree with the holders of the consolidated bonds to be issued hereunder, that said indebtedness shall not be increased beyond the said sum," during the period between 1874 and 1914, *i. e.*, forty years. Sec. 13.

The supplemental funding act of 1875 prohibits the funding board from exchanging consols for certain particularized bonds and warrants, the legality of which is or has been questioned, until same, by a " final decree of the Supreme Court, have been declared legal and valid obligations of the State of Louisiana;" and, as if to place a statutory interpretation on that phrase, it further declares, " and that were issued in strict conformity to law, and not in violation of the Constitution of the State, or of the United States, and for a valid consideration." Sec. 1, Act 11 of 1875.

In the light of the foregoing facts stated in relation to the history and incidents of the Citizen Bank bonds, the question is, whether or not they constitute a part of the bonded debt of the State, or are valid outstanding bonds of the State, in the sense of the act of 1874? Whether or not they are such bonds as are denominated valid obligations of the State, or such as were issued in strict conformity to law, in the sense of the act of 1875 ?

To these questions I feel bound to make an affirmative answer; and having so replied, I necessarily conclude that said bonds are fundable, notwithstanding they are surety obligations of the State.

### III.

The next question to which I will direct attention, is the date at which, or as of which, the funding shall take place—as of date January 1, 1874, or of the date of filing this suit?

It is quite significant that the funding statute of 1874 provides that certain designated officers " shall cause to be prepared and to issue bonds to be known as consolidated bonds of the State of Louisiana, * * *all payable forty years from the first of January, 1874; and all to be numbered consecutively, and made payable to bearer,*" etc. Sec. 1, Act 3 of 1874.

This provision is mandatory in terms, and seems to indicate the creation of a systematized issue of bonds, having uniformity in date, maturity and form; so that the debt of the State might be brought within certain prescribed and well-defined limits, and placed within the reach of adequate appropriation for the payment of interest.

This law seems to give neither the bondholder nor the Board of Liquidation any discretion in the premises. A· creditor, accepting the grace of the statute, is bound to accept it just as it is offered; and the Funding Board is *only* authorized to issue in exchange for the bonds that are surrendered, bonds of the description given in the statute.

It further provides that said consols shall bear interest at the rate of 7 per cent. per annum, payable semi-annually, and interest coupons shall be annexed.

This is in exact keeping with the prayer of the plaintiffs' petition, *pro tanto*.

### IV.

My examination of this case, and a most careful perusal of the briefs, and the exceptionally able opinion of the District Judge, has led me to a contrary view from that entertained by him, and urged by defendant's counsel, that the State had been absolved from her obligations as a surety, and, for that reason, the bonds of plaintiffs could not be funded.

In my opinion, every step that has been taken—every act that has been done—on the part of the plaintiffs, in reference to these bonds, was authorized by the State and solicited by the Citizens Bank.

The compromise and compact of 1880 was thus authorized and solicited, though I am not prepared to say that the State is *bound by, and not relievable from, the terms and conditions of the contract.* The idea I wish to convey is that the Hope Company and the Citizens Bank were authorized by a legislative enactment to treat with each other, and the State is equitably estopped from denying the authenticity of her own mandate, or the permission she gave to enter

into a compact for her own discharge; though the particular act done is not absolutely binding on her.

The plaintiffs had a perfect right to extend the time for the payment of their bonds, as they were specially authorized so to do.

The assets of the mortgage-stock department of the Citizens Bank having been pledged to the State and the plaintiffs jointly, as a security for the payment of *these bonds exclusively* (Act 3 of January, 1836), the latter had authority to deal with them in any way they chose, not inconsistent with their covenants with the bank and the State.

But the negotiations of the plaintiffs with the bank had not reached the stage of an absolute *appropriation* of the assets. They had received them on deposit, and the money also. In their dealings with the bank in 1880, they only released the *banking* department, as never having bound itself at all. Hence, it can not be said that, by any act of the plaintiffs, the State's subrogation has been lost. R. C. C., 3061.

## V.

On this theory and argument, what is the proper disposition to be made of the issues involved?

If the bonds presented are fundable—and they are—the first question is, How many consols are the plaintiffs entitled to receive? Sixty cents on the dollar of what amount? Inasmuch as the funding must be made as of January 1, 1874, the *status* of the plaintiffs claim must be taken as of that date. This is in keeping with the plaintiffs demand and the argument of their counsel. On that date, it is evident, the plaintiffs claim was in *statu quo*.

It is an undisputed fact that nothing has been paid on the capital of the bonds, but that, on the contrary, there are large arrearages of interest due and unpaid; yet plaintiffs counsel admit that the Hope Company has no right to claim in consols anything on the score of interest. They say:

"That the coupons represented in ' warrants for extended coupons' [are] not fundable, is clear from the face of the funding legislation, which nowhere provides for funding of coupons." Sup. brief, p. 3.

Then the matter stands thus: The plaintiffs are entitled to consolidated bonds of the series authorized by the funding act of 1874, bearing date January 1, of that year, and maturing in forty years

thereafter, that is, on the 1st of January, 1914; with interest coupons attached, payable semi-annually, at the rate of 7 per cent. per annum, up to the 1st of January, 1880, and from and after the 1st of January, 1881, at the rate of 2 per cent. for four years, and at the rate of 4 per. cent. per annum thereafter—the interest coupon of 1880 having been remitted—in exchange for the Citizens Bank bonds, at the rate of 60 cents on the dollar of the latter.

The capital sum being $4,018,626.48, the plaintiffs are entitled to consols aggregating in amount $2,411,175.88, with all interest coupons since the 1st of January, 1874, attached thereto. Inasmuch as the Citizens Bank bonds to be exchanged were extended to 1901, 1902, 1909, and 1911, respectively, no actual settlement can be made between the plaintiff and the State—the former surrendering bonds not yet due, in exchange for consols of the State to mature in the future.

But notwithstanding no final adjustment can be made at this time, I think it proper and right, and an act of simple justice to the State, that the mutual relations of the State to the plaintiffs and the Citizens Bank should be *stated*, and suitable restrictions imposed upon the plaintiffs, as a condition precedent, *sine qua non*, to the execution of the decree of the court, and to the consummation of the funding of the bonds.

In the first place, it is plaintiffs duty, the performance of which must be required at their hands, to surrender to the Board of Liquidation the whole of the Citizens Bank bonds, which are to be given in exchange for consolidated bonds—they being allowed to receive and retain all interest coupons thereto attached, and all interest debentures or warrants for unpaid interest, whether due or to become due.

The State is entitled to these bonds for use in making a settlement with the bank, as her principal; and the plaintiffs, by their acceptance of the consols in exchange therefor, necessarily absolve the State and the bank from any and all liability thereon, and must look to the consols and their interest for her recourse, alone.

In other words, the novation of its obligation is to be full and complete.

A further consequence and necessary result of the funding *nunc pro tunc* is, that the novation takes place as of date January 1, 1874, as well as the funding; for one is but the consequence of the other.

The plaintiffs can not maintain the contract in its integrity for one purpose, and for another purpose insist that it was, in effect, surrendered and yielded up fifteen years ago.

It appears that under and by virtue of the compromise of the 8th of October, 1880, the mortgage-stock department of the Citizens Bank has collected and remitted to the plaintiffs a sum "aggregating $2,060,466.35;" and that this sum was realized from the assets in the possession of that department of the bank which were jointly pledged to the plaintiffs and to the State, as security for the faithful performance of the bank's obligation to the State as its surety, as well as the bank's obligation to the plaintiffs for the payment of the *capital* of the bonds.

This fact is acknowledged by the plaintiffs counsel. Brief, p. 9.

This sum was realized and remitted to the plaintiffs "subsequently to the 20th of January, 1881." *Id.*

It is evident that this sum must be at once restored to the State, as a condition precedent to liquidation.

It further appears that "there is still on hand, applicable to the aforesaid bonds   *   *   a large amount of mortgage stock assets of the Citizens Bank, *not yet realized and remitted to the bondholders;* that these assets consist of stock mortgages given under the act of 1836, on the property of the shareholders of the bank to secure their stock subscription; property which the bank has been unable to sell, acquired under foreclosure of such stock mortgages; mortgages not collected, given for mortgage stock; property acquired by the bank under such foreclosure, and afterwards sold by the bank; and amounts due by shareholders on their stock subscriptions—the *value* of said assets and property, applicable to the payment of said bonds, being about $800,000." See admission printed in defendant's brief at p. 9.

It is likewise evident that those assets must be restored to the State as pledgee thereof, and as surety of the Citizens Bank, as a further condition precedent to the funding of the plaintiffs bonds.

It appears that by an act of the Legislature, there was a change made in the charter of the Citizens Bank in 1853, whereby a banking department was added to the theretofore property bank, and fresh capital in money was subscribed—it being the legislative intention and purpose that these two departments should act separately and independently of each other.

Hence, since the banking department was established under the law of 1853, it has done a legitimate banking business, while the property bank, or, as it is familiarly termed, the mortgage-stock department, has pursued its particular branch of business—though virtually engaged in a liquidation of its affairs and endeavoring to realize on its assets.   Pollock vs. Citizens Bank, 12 An. 230.

While this division of the bank into two departments, is doubted and denied by the defendant, and with some show of plausibility for the contention, yet the compromise of 1880 proceeded on that theory, and the State apparently acquiesced in that condition of things.

In fact, I fail to see the impropriety or impracticability of such an arrangement.   It is an established fact that, on the faith of the legislative authority aforesaid, $100,000 of *fresh money capital* was subscribed and actually paid into this new banking department; and it could not be supposed that this would have been done if the subscribers had believed that these assets would, in any event, have become liable for the large claims of the plaintiff.

But, by this arrangement, the Legislature did not charter a *new* bank, but merely permitted the organization and equipment of a *banking department, per se*, as an addition to the existing *property bank*, by the subscription of a specified amount of fresh |capital— the stockholders in the property bank being accorded a preference in taking stock in the new department, to a limited extent.

In my opinion, the obligations of the property, or mortgage department, of the bank, were unaltered or unaffected thereby— neither were they diminished or increased—*and the banking department never incurred any liability to the plaintiff*, and never acquired any interest in, or right to, the assets of the mortgage department.   Accepting this view of the character and organization of the bank, it becomes necessary to examine into plaintiffs responsibility for the sum of $500,000 of mortgage] assets of the property department, which were by them received and applied to the payment of interest on their bonds prior to 1868.

It is true, as a matter of fact, that, as between the plaintiffs and the Citizens Bank—both departments thereof—this claim was adjusted in the compromise of 1880; but, while it was authorized by the Legislature, the State was not a party to the compact, and is not concluded thereby.

The facts may be fairly summarized thus:

In 1853, when the banking department of the Citizens Bank was organized, there was withdrawn from the mortgage stock department $500,000 of assets, and same were carried to the credit of, and were reduced to possession by, the banking department, and constituted a part of its capital. The banking department thereby became the debtor of the mortgage-stock department for the sum of $300,000, as the admitted value of said assets. Subsequently, the banking department made advances to the mortgage-stock department, at different times in different amounts, aggregating about $650,000, with which the latter paid *its* interest to Hope & Co., and was credited therewith. In the compromise of 1880 the mutual account of these three parties were squared and settled.

By this arrangement the " pledged assets " of the State were illegally attributed to the discharge of interest claims which she did not owe, and to this absorption of these values the plaintiffs made themselves parties, and they thus came under an obligation to the State for restitution thereof—and this, notwithstanding the mortgage-stock department of the Citizens Bank is likewise bound. I am, therefore, of opinion that the restitution of this amount, without interest, must likewise be imposed as a condition precedent to the funding of the plaintiffs bonds.

While it is perfectly true, as stated above, that no formal settlement can *now* be required, because of the immaturity of the plaintiffs bonds, yet this must be restricted to the capital therof, because, when consols shall be issued to the plaintiffs in exchange for bonds, there will be matured interest coupons attached, which will represent interest accumulations thereon since January 1, 1874, to date of issuance and delivery to the plaintiffs.

As the result of a hasty calculation, the aggregate amount of this interest on consols will be $1,651,535 on the 1st of January, 1891. Deducting this sum from the amount now in the plaintiffs hands, there will still remain a sum of about $400,000 to be placed to the credit of the *capital of the consols* on that date, and which could at his option be applied thereto by taking less.

It further appears that there are in the coffers of the bank $85,000, which was realized from the " pledged assets," and it should also be applied as a credit, or surrendered to the State as a further condition precedent to funding of plaintiffs bonds.

Upon the plaintiffs acceptance of consolidated bonds, under the terms and restrictions imposed, the State, as surety of the bank, is entitled, and is of right subrogated to, all of the rights, as well as securities of the plaintiffs. R. C. C., 3052, 3053. She is also entitled to an accounting by the mortgage-stock department of the bank, which right ought to be reserved.

These are the views I entertain, but I am willing to so modify my conclusions as to concur in the decree, as to values, amounts and interest.

## SEPARATE OPINION.

FENNER, J. On two propositions, I think, prior decisions of this court preclude further controversy. These are:

1. That, as regards the holders of these bonds, the State is liable as a principal obligor and not as surety.

2. That the bonds were fundable under the terms of the funding acts.

### I.

Notwithstanding certain slight differences in the terms of the respective laws and in the forms of endorsement, the bonds issued in aid of the Citizens Bank stand on the same basis with those issued in aid of the Consolidated Association of the Planters of Louisiana.

The bonds themselves are identical in form. In both cases, the State, on the face of the bonds, acknowledged herself indebted to the bank in a certain sum of money, and promised to pay the said sum with the stipulated interest to the order of ̞the bank. In both cases the bonds were issued in aid of the bank and under laws which required the bank to ̞pay the interest and principal of the bonds as they became due, and to protect the State against all liability thereon. Although in the endorsement provided for the Citizens Bank bonds, the bank expressly bound itself to pay the principal and interest as they matured, while the endorsement of the Consolidated Planters' bonds contained no such stipulation, the former endorsement could not restrict the unconditional obligation of the State already expressed on the face of the bonds, but only added thereto a like unconditional obligation on the part of the bank.

All the questions affecting the nature of the State's obligation on the Planters' consolidated bonds and their fundability have been considered and determined by this court in three cases. Lessassier &

49*

Binder vs. Board, 30 An. 611; Forstall's Sons vs. Board, Id. 1151; Forstall vs. Bank, 34 An. 771.

We consider that these decisions fully cover and determine the same questions as to the Citizens Bank bonds.

In Forstall's Sons vs. Board, 30 An., p. 1152, this court said, speaking of the bonds: "They are unquestioned and unquestionably debts of the State of Louisiana, possessing all the requisites and characteristics, as we held in the Lessassier & Binder case, which entitle them to be exchanged for consolidated bonds, under the provisions of the funding law and its amendment."

In Lessassier & Binder, page 615, after transcribing the words of the bond, "The State of Louisiana acknowledges to be indebted unto the Consolidated Association of the Planters of Louisiana in the sum of $1000, which sum the State of Louisiana promises to pay, * * *," etc., this court said:

"Such words do not, can not, create or describe an accessory promise. Those words are the studied and clear expression of a principal obligation of an unconditional promise.

"Can we add to those terms? Can we arbitrarily presume that the State did not intend to bind itself, as, in law and in fact, she is bound by the terms of her contract; that, when she said without reservation, 'I acknowledge to be indebted, I promise to pay'—it meant, though she said just the reverse, indebted as a surety, the surety of one who, in the instrument, is recognized as a creditor, and pay in case my recognized creditor fails to do so. This would be a perversion of the very letter of the contract submitted to our consideration.

*      *      *      *      *      *      *      *      *

"Whatever may be, as between the State and the Consolidated Association, the liabilities of the latter to the former, as to third parties and those bonds, the State was, and has not ceased to be, a principal debtor, and, as to third parties, can not be legally regarded as the surety of one who, in those bonds, is represented as its creditor."

In Forstall's Sons, page 1152, the court says, resuming an equally unanswerable reasoning on this point:

"Whatever may be the relation between the State and the association, *as between themselves*, by no possible interpretation can the State be considered anything less or other than the principal, and indeed the sole, obligor upon the bonds, as to the holders thereof.

Hope & Co. vs. Board of Liquidation.

"They are no accessory, but original and principal obligations, not payable contingently, but absolutely and at all events."

Even the two dissenting judges in this case, Justice Spencer and Chief Justice Manning, while they did not agree with the majority of the court on the question of the bonds being fundable under the acts of 1874 and 1875, declared, with the same positiveness as the decision itself, that they were *absolute and valid* debts of the State. See Dissenting Opinion at page 1153.

On the subject of the indorsement, this court said, in Lessassier & Binder, at page 616: "The indorsement on these bonds does, in no way, change or impair the unqualified and unconditional obligation of the State to satisfy said bonds. It adds to the State obligation that of the Consolidated Association."

And in Forstall's Sons, at page 1152, this court said again: "The fact that the act made them [the bonds] transferable by the indorsement of the president and cashier of the association, no more modified or changed the obligation of the State than if they had been drawn payable to bearer, or had been the obligations of any individual or private person."

And again, in O. J. Forstall's case, 34 An. p. 776, this court said: "The declaration in the indorsement was a superfluity for the incurring of the obligation [that of the bank], which already existed and was not thereby absolutely created. The indorsement was, however, a legal formality required for the negotiability of the obligations or bonds."

The case of Forstall's Sons was decided after the Pacific Railroad case. 30 An. 980. It was rendered by the same court, and on full consideration of the Pacific Railroad case, and it overruled the suggestion contained in the latter, to the effect that these bonds were not embraced in the funding scheme.

The later decision of this court, in Adams & Co. vs. Board, 39 An. 689, referred to the Pacific Railroad case only as establishing the principle that bonds not intended to be embraced in the funding scheme could not be funded; and we held that the particular bonds therein concerned, being bonds issued under the Confederate régime, were not within the purview of the act; but we meant and said nothing to abrade the authority of the decisions referred to holding that the bonds of the State issued in aid of the property banks were fundable.

## II.

But while thus holding, very different questions present themselves, in determining whether or not the plaintiffs have preserved their right to accept the proposition made to them by the State in her funding laws, or have, by their conduct and dealings, lost it. It is all important, at the outset of this discussion, to have a clear comprehension of the meaning and effect of the funding acts of the State. They embody a simple proposition, made by the State to her creditors, to exchange the consolidated bonds issued under the acts for " valid outstanding bonds and warrants of the State, at the rate of sixty cents in consolidated bonds for one dollar in outstanding bonds and warrants." No creditor was bound to accept this proposition. Every creditor falling within its terms had the right to accept it, provided he accepted it precisely as made. It provided distinctly for an exchange. No creditor could receive consolidated bonds without surrendering to the State the bonds or warrants held by him, with all the rights and obligations evidenced thereby. Section 8 of the original Act No. 3, of 1874, required that the bonds and warrants so surrendered should be destroyed; but when the question arose as to the funding of the bonds issued in aid of the Consolidated Planters Bank, the Legislature provided, by Act 20, of 1878, that such bonds, if funded, should not be destroyed, but should be " preserved as evidence of the obligation of the corporation to the State," which direction would necessarily apply to the Citizens Bank Bonds, if surrendered.

After the exchange, all claims of the holders of the bonds, against either the State or the bank, would be completely effaced, or transferred to the State, as effectively as if the bonds had been sold to a third person.

The funding act fixed no time within which the proposition made by the State should be accepted by the creditors, and, therefore, such acceptance could be made at any time before withdrawn, or, at least, " within such time as the situation of the parties and the nature of the contract shall prove it was the intention of the proposer to allow." Rev. C. C. 1802.

But the Code further declares: " The acceptance, to form a contract, must be, in all things, conformable to the offer; any condition or limitation contained in the acceptance of that which formed the matter of the offer, gives him who makes the offer a right to with-

draw it" (Art. 1805). And further: "This takes place even when more is promised than was demanded, or when less is offered than was required. * * * The modification or change of the proposition is, in all respects, considered as a new offer, and the party making it is bound by the acceptance in the same manner as if the original proposition has been made by him." Art. 1806.

All parties agree that, as to their construction and effect, the proposition made by the State and the acceptance by the creditors, whenever the latter is signified, must both be governed by the facts and conditions prevailing on January 1, 1874. No matter how long afterward the creditor might accept, the proposition obliged the State to deliver, in the exchange, consolidated bonds bearing date January 1, 1874, payable forty years after date, and with coupons attached for interest to be paid semi-annually from the same date. And so, whenever he might accept, the creditor was bound to surrender to the State the old bonds, with all the obligations evidenced thereby intact, as they existed on the 1st day of January, 1874.

Let us now consider the condition of affairs as existing at this crucial date.

At that date the plaintiffs held bonds of the State of Louisiana issued in aid of the Citizens Bank aggregating, in amount of principal, the sum of $4,118,222.29.

These bonds, with the indorsement thereon, represented absolute indebtedness to the holders by both the parties thereto, viz., (1) the State, and (2) the Citizens Bank; and the holders had the right to call upon either or both for payment in full. But under the law by virtue of which the bonds were issued, as between the State and the bank, the latter was primarily bound to pay and was bound to protect the State against any liability thereon.

By the 3d section of the Act of January 30, 1836, under which the bonds were issued, it was provided: "That for the guarantee of the bonds to be emitted by the State, in favor of the Citizens Bank, and of the interest thereof, and for which the State pledges its faith, all the securities granted by the act of incorporation of said bank, and especially by the 3d and 4th sections of said act, to the holders of its bonds, *are hereby transferred to the State and to the holders of the bonds which may be issued in virtue of this act;* and the Governor shall only emit the State bonds after it shall have been proved to him by the certificate of the president of the bank, that mortgages have been

subscribed by the stockholders of said bank, in conformity with the charter, for at least one-fifth more than the bonds required; *and both the capital and interest of said bonds shall be paid by the bank at the time they shall become due.*"

The nature of the securities thus transferred is defined in Sections 3, 4, 5, 6, 7 and 28 of the original charter, Act of April 1, 1833. They consist of mortgages granted by the stockholders as security for their subscriptions of stock, in a sum exceeding by one-fifth all the bonds issued, and of which a large amount was extant when the funding acts were passed.

It thus conclusively appears that, at the date of the funding act, the holders of these bonds and the State held jointly these valuable securities as a pledge for their common benefit and protection. Had the holders of these bonds then accepted the proposition made by the State, what would have been the result? As already shown, they would have received from the State consolidated bonds, and they would have surrendered to the State the secured bonds. By the effect of this exchange, plaintiffs would have ceased to be *holders* of the bonds, and would have lost the sole quality in virtue of which they had any claim upon the pledged securities for the payment of the bonds. The State would then have become the holder of the bonds, and would have thus become the sole holder of the pledged securities, so far at least as they were affected to the payment of the bonds. The State never made any other proposition to plaintiffs than the above; and plaintiffs had no power to bind the State otherwise than by its unconditional acceptance. Suppose plaintiffs had then said to the State: "We are willing to accept your proposition, provided you will allow us first to liquidate our common securities; if they pay more than the value of the bonds which you offer us, we will get the benefit of it and will call on you for nothing; if they pay less, you will only fund the difference." Evidently this would not have been an acceptance of the proposition made by the State; it would have been a new proposition, which could not bind the State unless accepted by the State.

Or suppose the plaintiffs had then offered such a kind of acceptance to the funding board, what would have been the possible answer, except that the board had no powers other than those conferred by the terms of the law, and could add no conditions thereto?

Yet, what have plaintiffs done? Instead of accepting the propo-

sition of the State as made—instead of surrendering their bonds to the State with all the securities attaching thereto and including their claim against the bank itself on these bonds—they have chosen, during all these long years, to retain their bonds and to look to and deal with the bank as debtor thereon; they have retained their hold on the pledged securities; they have participated in their liquidation; they have collected and appropriated over two million dollars from the proceeds of these securities; they have taken the chances of realizing more than the value of the consolidated bonds, which they might have received under the proposition of the State; and now, when it turns out that the securities are inadequate, they come to the funding board and demand the funding of the deficiency.

I think the funding board is bound to reply that it has no mandate in the premises except that conferred by the funding act; that this mandate is confined to executing the proposition made by the State when accepted by the creditor as made, and according to the conditions existing at that time; and that plaintiffs, having failed to accept the proposition while those conditions existed, and having altered the conditions in such manner that they can not be restored, have lost the right to fund.

It seems to me clear that the plaintiffs had the option either to accept the proposition of the State, thereby surrendering the bonds and relinquishing all claims thereon, either against the bank or the securities, or to retain their bonds, and to look for satisfaction to the obligor thereon, and to the securities. They were bound to make their election. They could not first exhaust their right against the bank and the securities, and then claim the funding by the State.

It is true that Act 79 of 1880 authorized the Citizens Bank to make compromises and settlements with its mortgage stockholders, and to apply the sum realized to the payment of these bonds.

But this act does not purport to amend, or refer to, the funding acts.

It was passed six years later, and at a time when it might well have been supposed that these bondholders did not intend to accept the proposition of the State. It does not enlarge or alter, in any respect, the proposition made in the funding act, or the duties of the board constituted thereby. It seems rather to have been passed with a distinct understanding that these bondholders had declined, or would decline, to accept the proposition. It said, to the bond-

holders, in substance: "If you decline the proposition made by the State—if you prefer to retain your claim against the bank, and your recourse upon the pledged securities, rather than to surrender them with your bonds, in exchange for consolidated bonds, the State acknowledges your right to do so, and will pass this act to facilitate you in the liquidation of your claims, and to enable you to get out of them the largest possible result."

The acceptance of this act by the bondholders, and their action under it, as evidenced by the elaborate compact entered into between them and the bank, operated, in my opinion, a complete abandonment of their right to fund under the existing law.

Be it well understood, that I am not discussing the question of the effect of their action upon their claim against the State. It may well be that, after a fair and honest liquidation of these pledged securities made with the consent of the State, they may still hold the State as bound for any resulting deficiency. It may well be that sound policy and honorable duty would suggest to the State the propriety of passing an amendment to her funding law which would admit plaintffs to the privilege of settling their ultimate claim against the State on the same basis with other creditors. But as this court said in Lord Cecil's case, "We are not the law-making power of the State; the policy or impolicy, the good or bad faith, of an enactment such as the Funding Bill of 1874 is beyond our inquiry." 30 An. 38.

This court is bound to take the law as it finds it. Our only function is to determine whether, under the law as passed, it is the duty of the respondent board, having no power or duty beyond the terms of the law, to fund the bonds of plaintiffs. Holding that plaintiffs have not accepted the proposition made by the State, and have, by their own action, placed it beyond their power to comply with the essential terms of the proposition, I am bound to say that the board complies with its duty under the law in refusing to fund.

The functions imposed by the law upon the Board of Liquidation are, and were intended to be, of the simplest character, requiring nothing more difficult than a calculation of 60 per cent. of the face of valid bonds and warrants tendered for exchange. If the plaintiffs had accepted the proposition of the State as made, there would have been nothing to do except for them to surrender their bonds and receive consolidated bonds for 60 *per cent.* in exchange.

But under the course pursued by plaintiffs and under the demand

as now made, the board finds itself confronted with one of the most difficult problems conceivable, involving a marshaling of assets, the ranking of claims, the imputation of payments, investigation and settlement of accounts, and all kinds of troublesome questions. The learned counsel on either side differ widely on all these points. The mere fact that the case bristles with such difficulties indicates how far the course of relators departs from the acceptance of the simple proposition made by the State.

The State has never referred the settlement of such important questions, affecting her rights and obligations, to the Board of Liquidation, or even to the Judiciary. The sole question referred, under the terms of the funding act, to judicial determination, and the sole jurisdiction conferred upon the courts, extend no further than to declare whether or not bonds or warrants presented for funding are "legal, valid obligations against the State of Louisiana, issued in strict conformity to law, and not in violation of the Constitution of the State or of the United States, and for a valid consideration." Act 11 of 1875, Sec. 1.

We are asked in this case to determine as between the plaintiffs, the bank, and the State, that an indebtedness of the bank to plaintiffs, for which the State is not bound, or denies that she is bound, and exceeding $1,000,000, enjoys a concurrent privilege with the State on the pledged securities, and, indeed, in effect, a superior privilege, because it is claimed that, under the law as to imputation of payments, their indebtedness is entitled to be first paid out of the sums collected on these securities. Certainly this is a question of vast importance to the State. The State is sovereign, and exempt from suit without her consent. Where is the law by which the State has authorized the funding board, or the judiciary, to take cognizance of such a claim against her? Certainly no such authority is found in the funding acts. Moreover, how could such a question be determined without the presence of the Citizens Bank, which is not a party to this suit?

The subject might be further pursued by a statement of other like issues involved. But this is sufficient, in my opinion, to show the impossibility of plaintiffs' position and its entire inconsistency with their claim that they preserve the right to accept the proposition made by the State, and have not, by their conduct, abandoned and destroyed the right, which they might once have had, to fund these bonds.

No one is more sincerely anxious than myself to see the State perform honorably and justly all her obligations. Perhaps, if I felt authorized in this proceeding to take part in the final adjustment, between the State and plaintiffs, of the rights and obligations arising out of these transactions, I might, in some respects, hold views more favorable to the latter than those reached by the court.

While my opinion, as herein expressed, prevents me from participating in the decree, it is, no doubt, fortunate for the State to have this matter settled. The adjustment effected by the decree of the court, while far beneath the claim of plaintiffs, may yet be more satisfactory to them than would be the rejection of their demand for funding and the preservation of their rights against the State, in other respects, intact. If so, I do not hesitate to say that the adjustment is one most favorable to the State, and should be entirely acceptable to her. I dissent.

### DISSENTING OPINION.

McENERY, J. The Act of the General Assembly authorizing the issue of the bonds sued on—the subsequent legislation concerning the same—the acts of the parties—the State, the bank, and the plaintiffs, Hope & Co., all show conclusively that the bonds were issued in aid of the Citizens Bank, which was the principal debtor. Although the bonds were issued by the State, still it is undeniable that the obligation of the State was that of surety.

The record shows that in 1880, by agreement, which was made for a consideration, the plaintiffs released the Citizens Bank from any liability on the bonds, and looked not to the corporation for payment, but to certain assets of the bank, set aside for this purpose. The fact of the release of the bank is not disputed.

Under the plain provisions of the Code, the State, by this release, was discharged from liability.

Art. 2205 of the Civil Code is as follows: " The remission, or even conventional discharge, granted to a principal debtor, discharges the sureties."

But suppose that there was no conventional discharge, or remission, of the debt in favor of the principal, the State was discharged from liability under her contract of suretyship.

" The surety is discharged when, by the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety." C. C. 3061; C. N. 2038.

The bank was a corporation created by the laws of the State of Louisiana. It was not divided into separate departments. Its assets were not so separated as to be mangaed by a separate department.

By agreement between Hope & Co. and the bank, a portion of the bank assets was actually put in the hands of receivers for the benefit of the bondholders, Hope & Co. The mortgaged property, which secured the bonds, was separated from the bank assets proper and devoted exclusively to the payment of the bondholders. This property was administered exclusively for their benefit. All claims of the bank upon this mortgage security were abandoned in favor of the bondholders. The bondholders accepted these securities in lieu of any claim against the banking department of the Citizens Bank. Large amounts of mortgaged property were sold and remittances to large amounts forwarded to Hope & Co. It is immaterial in considering the effects of this agreement to accurately state the amounts. It is sufficient to state that the securities thus surrendered would have been the property of the State in case she had been called on in the first instance to pay the debt.

The State, now, can not be subrogated to the rights, mortgages and privileges which Hope & Co. held against the Citizens Bank.

"The voluntary acceptance on the part of the creditor, of an immovable or any other property, in payment of the principal debt, is a full discharge of the surety, and in case the creditor should be afterwards evicted from the property so accepted." C. C. 3062.

There is no doubt that the creditors, Hope & Co., accepted this transfer of the mortgage assets in satisfaction of their bonds. If not, why did they release the Citizens Bank from the obligation to pay the bonds? They evidently intended to look exclusively to the securities set apart by the bank, under the agreement, for the payment of their bonds. They have squeezed, wasted and diverted the bank effects until scarcely any available assets are left. They now come, in a desperate fit of disappointment, to make the State assume the indebtedness. There is neither law or equity in this demand. To fund these bonds, I think, would be to make an absolute donation to Hope & Co., equally as wrongful and illegal as the first issue of the bonds upon which this suit is brought.

I think the bonds are null and void, so far as they attempt to bind the State.

These bonds were issued for no legitimate purpose of government.

The bank was not an institution of the State, and in no way was it connected with the government as an adjunct to its financial department. The obligation of the State either as surety or principal was not warranted by the Constitution. That it did not prohibit their issue did not authorize the Legislature to transcend the legitimate purpose of government, and give way to a private corporation the money of the taxpayer.

To pay the amount ordered to be funded will require the levying of an additional tax burden for this purpose.

In the case of Loan Association vs. Topeka, 20 Wal., p. 664, Mr. Justice Miller, the organ of the court, said:

" We have referred to this history of the contest over aid to railroads by taxation, to show the strongest advocates for the validity of these laws never placed it on the ground of the unlimited power in the State Legislature to tax the people, but conceded that when the purpose, for which the tax was to be issued, could no longer be fully claimed to have this public character, but was purely in aid of private or personal objects, the law authorizing it was beyond the legislative power, and was an unauthorized invasion of private rights.

" It must be conceded that there are such rights in every free government, beyond the control of the State. A government which recognized no such rights, which held the lives, the liberty and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depository of power, is after all but a depotism."

\*        \*        \*        \*        \*        \*        \*        \*        \*

" The theory of our government, State and National, is opposed to the deposit of unlimited power anywhere. The executive, the legislative, and the judicial branches of these governments are all of limited and defined powers.

" Of all the powers of government, that of taxation is most liable to abuse."

\*        \*        \*        \*        \*        \*        \*        \*        \*

" The power to tax is, therefore, the strongest, the most pervading, of all the powers of government, reaching directly or indirectly to all classes of the people."

\*        \*        \*        \*        \*        \*        \*        \*        \*

" This power can as readily be employed against one class of indi-

viduals, and in favor of another, so as to ruin the one class and give unlimited wealth and property to the other, if there is no implied limitation of the uses for which the power may be exercised.

"To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals, to aid private enterprises and build up private factories, s none the less a robbery because it is done under the forms of law, and is called taxation. This is not legislation. It is a decree under legislative forms." Cooley on Con. Lim. 479.

The bonds of plaintiffs were issued in aid of a purely private enterprise, in favor of a banking corporation, in no way connected with the State. They were not issued by the State to raise money for public purposes. These bonds are covered by the opinion of the United States Court, quoted above.

If the State is liable as principal, she can only be made so with the Citizens Bank as a solidary debtor. C. C. 2088, 2091.

Article 2203 of the Code says: "The remission or conventional discharge in favor of one of the co-debtors *in solido* discharges all the others unless the creditor has expressly reserved his right against the latter.

"In the latter case he can not claim the debt without making a deduction of the part of him to whom he has made the remission."

Under this view of the case, the State owes the plaintiffs nothing.

Under the funding act of 1874, the State could only be held liable for the bonds, less 40 per cent. Deduct this amount, and after which the amount remitted to the Citizens Bank, and credit the amount which would then be due by the State by the amounts paid since out of the mortgage assets turned over to the bank, and I do not think the liability of the State could be fixed for any appreciable amount.

The bonds in suit are not fundable, whether the State is considered as a surety or as a solidary debtor with the Citizens Bank. The Board of Liquidation has no judicial powers. From the statements in the record, it is evident that there are many questions to be determined, both as to law and fact. The liability of the State, if for any amount, must be ascertained by a judicial decree. The State, plaintiffs, and the bank, and the bank's relations with Hope & Co., the law applicable to the facts, and the facts which establish the amount and the State's liability, all have to be ascertained by

judicial investigation. Certainly the Board of Liquidation is without power to make this inquiry. The judicial investigation is referred to the courts, and expressly taken away from the Board. But what power is vested in the courts? It is defined by law, in Act 3 of 1874.

When suit is brought on a bond or *valid* warrant rejected by the Board of Liquidation, the investigation of the judiciary is entrusted exclusively to testing "the legality and validity of any issue of bonds of the State, or warrants drawn previous to the passage of said Act No. 3 of 1874," * * the legality and validity of which may have been, or may hereafter be, questioned, and to inquire into the consideration for which said bonds or warrants may have been issued.

If the State is liable as surety, her indebtedness depends upon a condition, and we have no power to say whether or not the circumstances are such as to fix her liability.

If the State is to be treated as a solidary debtor with the Citizens Bank, her liability depends upon whether or not the debt has been released, under what conditions it was released; and the exact amount for which she is liable is to be ascertained from the long and intricate transactions between Hope & Co. and the bank. These questions reach far beyond the investigation as to the legality and validity of certain issues of bonds.

Hope & Co., before these questions can be determined, must go to the political department of the government and get the required permission to sue the State.

It was never contemplated by the State, the bank and the bondholders, that these bonds were fundable. The State was never considered primarily liable.

The committee or commission, appointed by the Governor, in 1874, to ascertain the amount of the indebtedness of the State, never in its report included the bonds. On the amount of the existing debt against the State, as ascertained by the committee, which reported a list of valid obligations of the State, a constitutional amendment was adopted by the people limiting the debt. The bonds now before the court were not included in the list furnished by the committee and the amount upon which the indebtedness of the State was fixed. There was no protest by the holders of these bonds. They acquiesced in the legislation fixing the amount of the indebtedness of the State at

fifteen million dollars, which excluded these bonds. They after-wards dealt exclusively with the bank and looked to it for the payment of the bonds.

Seventeen years of silence is a period long enough to presume acquiescence in the action of the State in fixing her debt:

The suit of Hope & Co. has all the odor of a stale demand, and should be rejected on this, if no other grounds had been urged.

I dissent.

## ON REHEARING.

BREAUX, J.  Plaintiffs are pleased to state that we ignore the fact that all payments made on account of their claim against the State and the Citizens Bank, as co-debtors, have been made by the Citizens Bank and not by the State, and that we utterly fail to apply, or allow, the application of any part of the payments made by the Citizens Bank, or of the assets to it belonging, to the payment of the large amount of coupons of date anterior to 1874, and which, though not provided for by the State of Louisiana in the funding act, constitute valid obligations of the State and of the Citizens Bank.

The amount paid had not been applied to the satisfaction of any debt, at the time suit was brought.

If unauthorized application of payment had been made, to the State's prejudice, the result would not be thereby changed.

For the purposes of the trial, the following agreement was made:

"It is admitted that since the 8th of October, 1880, the Citizens Bank has paid and remitted to the bondholders, under the agreement of that date, two million sixty-four thousand four hundred and sixty-six dollars and thirty-five cents, to be imputed according to law."

In its decree the court followed the provision requiring that the "payment be imputed to the debt, which the debtor had at the time most interest in discharging."

The amount collected was not the property of the Citizens Bank, but the proceeds of collection on mortgages, deposited as a guarantee to the State, to protect her from loss, as one of the parties to the bonds.

"That for the guarantee of the bonds to be emitted by the State, in favor of the Citizens Bank, and of the interest thereof, and for which the State pledges its faith, all the securities granted by the act of incorporation of said bank, and especially the third and

fourth sections of said act, to the holders of its bonds, are hereby transferred to the State and the holders of the bonds." Act January 30, 1836.

Plaintiffs, in their petition, pray that the Board of Liquidation be ordered to receive the bonds, and to deliver to them in exchange consolidated bonds, bearing date the 1st January, 1874, with all coupons annexed from that date.

Under the terms of the law, they are to be funded as from said date.

After the funding, the collections made subsequent to that date are to be applied. Whether the funding be made fictitiously or actually makes no material difference.

It is of 1874, and the rights of parties are affected as of that date.

The plaintiffs complain of error in our decree, in that it applies assets now in the hands of the Citizens Bank to the payment of their demands, although they never have been received, and, they urge that the decree should be corrected so as to eliminate the value of these assets as a debt against plaintiffs but reserving the right of the State to exercise such recourse upon " said assets as plaintiffs subrogee or plaintiffs themselves might exercise."

In the agreement made for the purpose of the trial, it is admitted that there is still on hand applicable to the payment of the aforesaid bonds, issued under Acts of 1833 and 1836, a large amount of mortgage-stock assets, etc.—"the value of said assets and property applicable to the payment of said bonds is about eight hundred thousand dollars."

The plaintiffs would now have us change the destination of said bonds, and decree that they must be transferred to the State, and consols must issue without deducting these assets.

In the act of compromise of 1880, the plaintiffs virtually assume entire control of these assets, and the transfer to the State is treated as naught. It contains several declarations with reference to these assets.

We copy of these declarations the following: "The object and purpose of the same being to obtain a precise and full statement of the property and effects which the said Citizens Bank holds or controls to be appropriated to the payment of the debt aforesaid under the acts of the General Assembly." * * And when these shall be collected, the sum shall be appropriated to the payment of the debt of the State and of the bank.

The plaintiffs have not made a tender of these assets. It is certainly just and proper that the amounts "applicable to the payment of the aforesaid bonds" should remain where they are.

If this application of proceeds be altered, funding becomes an impossibility.

The State can not be made to issue her bonds to the amount of $800,000, when plaintiffs control assets to an amount, at least, equal to this sum; nor was it ever contemplated that the State should assume the active administration of this amount.

Where can we find authority to decree that the possessing of the assets shall be with the State, and that their management thereafter shall be in her name and for her account exclusively.

This would be practically decreeing that consols be surrendered for certain assets.

If the judgment were made, to whom would these assets be delivered? Who would collect them? What officer would have the control? These questions would suggest themselves if there were no statutes and compromises to prevent such a delivery and divestiture. But the statutes and different acts preclude placing the State in the attitude of a collecting agent, to save herself from losses arising from its obligations on bonds issued for the benefit of a private financial institution.

Plaintiffs complain that the money of the Citizens Bank is not applied to its debt for past due interest, but is exclusively applied to extinguish its principal debt, because the principal is fundable under the Funding Act, and the interest and warrants are not. "As the payments are made by the bank, and the bank is debtor for principal and interest, why should the well established principle of imputation be departed from in this case?" is the question propounded.

The plaintiffs will have it that the interest due, prior to funding, should be paid from the proceeds of assets.

The question arises, What is the demand of plaintiffs?

That their bonds be funded.

It is granted from the date of the statute, 1874.

Afterward two interest accounts are presented, for settlements from collections made in 1881, and after.

Which shall be first settled?

The State, under the law, can indicate which is the most onerous.

Both accounts should be paid. It is an issue of priority. At this

50

time the last account has the preference, for it is immediately connected with issues presented, and on the grounds heretofore mentioned the payments are applied in our decree.

It is also urged as error, that interest should not be calculated on amounts heretofore received.

The whole theory of the decision is inconsistent with the doctrine of imputation of payments, as invoked by plaintiffs.

The decision rests upon the restoration of the *status quo* of 1874, which has been disturbed by the course of conduct pursued by the plaintiffs.

If they had funded in 1874, they would have had no claim upon, and no right to collect, the pledged securities.

When they now apply to fund, their action in receiving these funds must be undone.

It is a condition precedent to their right to fund, that they must restore these collections to the State, as of the date when they were received.

This involves their repayment to the State, with legal interest during the time plaintiffs have held and used them. This is what we have required, and what plaintiffs are in law and equity bound to do.

These accountings are separate and independent of each other. If the plaintiffs had funded in 1874, and the State had made these collections, they would not have been imputable to the interest due on the consolidated bonds issued to them on which interest is otherwise provided for.

Such imputation can not then be required.

Our conclusions have not been reached without difficulty.

The changes made at the instance of plaintiffs have occasioned a number of issues.

They asked to fund, and a consequent settlement.

We thought it was due them.

A conclusion, *facere ne possumus*, would have relieved us from care and work.

The record has been examined, scrutinized. It discloses errors on the part of those who originally organized the banking scheme, now the subject of litigation.

They did not foresee the ruin which afterward disturbed and destroyed values during four years of the history of this banking enterprise. They were human.

It is not difficult to detect errors, after the fact, that would not have been thought of prior.

But we desire to state that in our close examination of the record we have not found any evidence of attempted wrong.

Since the rendition of our original decree it has been suggested, by the Attorney General, that some of the bonds averred by the plaintiffs are the property of the Citizens Bank, and should not be funded.

The Citizens Bank is not a party to this suit, and there is no evidence in the record to support the suggestion, so that this court can not act upon it, but the right, if any, of the State to refuse to fund such bonds should be and is reserved.

Rehearing refused.

Fenner, J., takes no part.

### ON APPLICATION FOR REHEARING.

WATKINS, J. (a) In my opinion, the State never was, and is not now, a co-debtor with the Citizens Bank, of the Hope & Co. bonds. The State was and is a surety only, and for the principal of the bonds, and not for the interest; for in the act of 1836 it is particularly stipulated that the bank shall mention in its indorsement the place at which it will pay the interest; and this individual covenant of the bank to pay interest formed a part of Hope & Co.'s acceptance of the bonds from the bank.

(b) As the State was not a principal debtor, and did not owe interest, she had a right to require the assets of the bank that had been transferred to her and the Hope company jointly applied to the capital of the bonds; and the opinion of the court so holds.

(c) Under the compromise and compact of 1880, Hope & Co. did receive the $800,000 of assets, as well as the funds on hand, which had been already realized from other assets pledged—at least, constructively, through the Citizens Bank as its agent—and they can be made to respond, as the opinion decrees, by taking less.

(d) There is no provision in the funding laws, that the interest coupons attached to consolidated bonds shall bear interest if not promptly paid at their respective maturities. On the contrary, special provision is made therein that a tax shall be annually assessed and collected for the purpose of paying the interest and principal of

these bonds, and it specially declares that "the revenue derived therefrom is hereby set apart and appropriated to that purpose and no other." Sec. 7, Act 3 of 1874.

This suit plainly illustrates the impossibility of such a demand. If plaintiff had presented its bonds for funding in 1874, they could have presented the interest coupons attached to consols received and collected them at their semi-annual maturities. That is all they are entitled to now. If there has not been collected and set apart a sufficient sum to meet their demands on interest account it is their own fault. But the opinion of the court allows the plaintiffs to withdraw from funds in their hands the full amount of the interest arrears due on coupons since 1874.

(e) There is nothing in Act 40 of 1874, except the extension of the Citizens Bank charter to the 30th of January, 1911; and power conferred on the bank "to extend, with the consent of the holders thereof, all the State bonds issued in its favor, under the second section of the act entitled an act, etc., * * approved January 30, 1836, now outstanding, as well as all interest warrants issued by said bank * * to such a time, and on such conditions as may be agreed upon with the holders of said bonds and interest warrants," etc.

This act and the conduct and acts of the parties under it are in keeping with their previous contract, under and in pursuance of the indorsement on the bonds. The bank issued, and the Hope Company received, interest debentures, or warrants, for arreared interest, signed by the bank alone, thus completely eliminating the State.

(f) According to the theory of the opinion, there are but two interest compilations to be made; first, on the consolidated bonds, from January 1, 1874, to the date same are issued to Hope & Co. in exchange for Citizens Bank bonds surrendered; second, on the various amounts that are collected by the bank on the pledged assets, and, from time to time, remitted to the Hope Company.

These two transactions are entirely distinct and separate, and are not component parts of one account, or transaction, and, therefore, the question of imputation of payments does not, in my opinion, arise.

During the whole period of time Hope & Co. held these sums in their hands they were ostensibly for the account of the *capital* of the Citizens Bank bonds, for the reason stated above, that the State

owed *no interest*, and, consequently, said sums could not be lawfully imputed to interest the State did not owe.

As the Hope people, in 1891, are for the first time awarded consols in exchange for Citizens Bank bonds, bearing interest from the 1st of January, 1874, a *settlement* is for the first time a possibility, and the decree of this court makes it such. Prior to this application and decree there was no *settlement* possible or demanded.

There is not, and can not be, any question of partial payments, or adjustment of accounts between the plaintiff and the State, personated by the Board of Liquidation.

The parties to the two transactions are different. The payments, or remittances, were made by the Citizens Bank, from moneys realized from the pledged assets, to its creditors, Hope & Co. When this suit was brought by Hope & Co. against the State, through the funding board, new issues were raised and new relations established, by our opinion and decree, wherein the State became bound for the payment of interest, on the terms and conditions set out in the funding laws.

Then it is clear, that remittances thus made and not applied, between 1880 and 1890, can not be considered and treated as partial payments made on account of *anticipated interest coupons on consolidated bonds not yet demanded or issued.*

For these reasons, I am of the opinion the application for rehearing should be refused.