## No. 11,097.

HOPE AND COMPANY VS. THE BOARD OF LIQUIDATION OF THE STATE DEBT.

108 315
113 152
113 154

### SYLLABUS.

1. The banking department of the Citizens' Bank of Louisiana was a new creation under the Act of 1853 and the compact or articles of association of that year, adopted in pursuance of the act.

2. The legislation of 1853 and the compact formed a new constitution of the bank, in virtue of which the banking department never became liable for the bonded indebtedness of the State incurred in 1836 in aid of the bank.

3. Being a new creation for the purpose of conducting a general banking business, and not being liable for the bonds of the State, it follows that the banking department had the capacity to purchase as an investment of separate funds, or in current business, the bonds in question, just as any other bank or third person could do.

4. This being so the purchase did not extinguish the bonds by confusion and the banking department is entitled to the benefits of the funding scheme in reference to the bonds it holds, in like manner as any other person would.

APPEAL from the Civil District Court, Parish of Orleans—
King, J.

*Farrar, Jonas, Kruttschnitt & Gurley, Henry Denis, Thomas J. Semmes,* for Plaintiffs, Appellants.

*Fenner, Henderson & Fenner, Eugene D. Saunders,* for Citizens' Bank of Louisiana, and Plaintiffs, Appellants.

*Milton J. Cunningham,* Attorney General, *Walter Guion,* Attorney General (*Charles M. Cunningham,* of Counsel), for Defendant, Appellee.

### STATEMENT OF THE CASE.

The opinion of the court was delivered by

BLANCHARD, J.  Under the Act of 1836 the State of Louisiana issued its bonds to the extent of $7,000,000.00 in aid of the Citizens' Bank of Louisiana.

Of this amount of bonds, there were, on the first of January, 1874, outstanding $4,018,626.48, represented by 9,042 bonds, each for the sum of $444.44.

By Act approved January 24, 1874, the State enacted the Funding Law and created the Board of Liquidation of the State Debt.

This act authorized the issue of bonds to be known as "consolidated bonds of the State of Louisiana," and directed the Board of Liquidation to exchange such bonds for valid, outstanding bonds of the State and valid warrants of the State at the rate of sixty cents in consolidated bonds for one dollar in outstanding bonds and warrants.

It seems that some years following the enactment of the Funding Act it was thought doubtful that bonds such as those issued in aid of the Citizens' Bank were fundable under the terms of the Act, and those of the supplemental law of May 17, 1875.

Finally, certain decisions were rendered by this court holding that bonds of a similar character were entitled to the benefits of the funding scheme.

Whereupon, Hope & Co., of Amsterdam, representing themselves to be the holders and owners of the 9,042 bonds still outstanding of the bonds issued to the Citizens' Bank, applied to the Board of Liquidation to fund the same under the Act of 1874.

The Board rejected this application.

Thereupon, Hope and Company brought suit in the Civil District Court of the Parish of Orleans to compel the Board to fund the bonds they held, and included in their demand to fund the coupons of the bonds remaining unpaid.

They prayed that the Board be condemned to receive the bonds and the coupons thereof, and to issue and deliver to them in exchange therefor consolidated bonds to the amount of $2,411,175.88.

The District Court held that the State's obligation upon the bonds was that of surety, not that of principal, or co-debtor, with the Citizens' Bank to the holders thereof; that the bonds were contingent liabilities of the State and, for that reason, excluded from the provisions of the Funding Act; that the holders of the bonds, Hope & Co., had discharged the principal obligor, the Citizens' Bank, and this act operated, likewise, the discharge of the State.

From this judgment Hope & Co. prosecuted an appeal to this court and in May, 1891 (43 La. Ann. 738), the court handed down its decision, reversing the judgment appealed from and decreeing the bonds valid obligations of the State entitled to the benefits of the funding scheme, but that the State was entitled to large credits (itemizing and detailing the same), to be applied in reduction of the

aggregate sum of the bonds held by Hope & Co., and that only the balance left due should be funded.

The Board of Liquidation was ordered to settle and liquidate the claim of the plaintiffs upon the principles and in accordance with the direction of the opinion of the court, and, on surrender of the bonds held by the plaintiffs, to issue to them consolidated bonds for the resulting balance, without the coupons attached thereto prior to the date of funding, which coupons were ordered to be cut off and canceled.

In a second opinion, denying the rehearing that had been applied for, the court, stating that since the rendition of the original decree a suggestion had been made by the Attorney General that some of the bonds declared on by Hope & Co. were the property of the Citizens' Bank, reserved whatever right the State had, if any, to refuse to fund such bonds so held.

Following this judgment and in obedience to its mandate, the Board of Liquidation met in October 1891 and proceeded to recast the account of Hope & Co. upon the basis of the opinion of the court, as follows:—

"Amount in capital (of bonds)......... $4,018,626 48
Less 40 per cent. under Act 3 of 1874.. 1,607,450 60

Leaving ..............................$2,411,175 88
7 per cent. interest for 5½ years...... 928,302 71
2 per cent. for 5 years................ 241,117 58
4 per cent. for 6 years and 5 months.... 618,868 45
1 month's interest at 4 per cent........ 8,037 25—$4,207,501 87
Less payments—credits allowed by the
     court .............................$2,060,466 35
Less payments—credits allowed by the
     court .......................... 722,451 03
Less payments—credits allowed by the
     court .......................... 300,000 00
Less payments—credits allowed by the
     court .......................... 885,000 00

                         $3,967,917 38
1 month's interest at 5 per cent. on $2,-
     060,466.35 ...................... 8,585 27—$3,976,502 65

Thus showing a balance of......................... $230,999 22
as the amount of consolidated bonds due."

The Board then declared it appeared that of the bonds held by Hope & Co. and presented by them for funding, 665 belonged to the Citizens' Bank, the principal obligor, and for which the State is only surety, and that the fundable amount due on these 665 bonds exceeded the balance of $230,999.22 due as aforesaid.

So holding, and considering the bonds belonging to the Bank not entitled to be funded because extinguished by confusion, the Board refused to fund the 665 bonds, or any part of them, or the $230,999.22 found to be the fundable balance due on all the bonds as aforesaid.

Whereupon the present suit was instituted to compel the Board to issue consolidated bonds for the balance of $230,999.22 found to be due under the judgment of the court in the former suit.

After reciting the history of the issue of bonds by the State in aid of the Citizens' Bank, the petition represents in substance:—

That Hope & Co. were and still are the holders of the 9,042 bonds under an agreement between them and various persons, owners of the bonds, by the terms of which the bonds were delivered to them (Hope & Co.) in trust for the purpose of securing unity of action on the part of all the holders of the bonds through them, and with full power in them (the petitioners) to institute any and all such actions at law and to take any and all such proceedings as they might deem proper and expedient for the purpose of securing the payment or refunding of the bonds, or otherwise realizing upon the same.

That whenever the owners of the bonds deposited the same with petitioners, the latter (Hope & Co.) gave receipts negotiable in form to the depositors of the bonds, acknowledging the deposit of the same, but that they (petitioners) never gave any such receipts to the Citizens' Bank of Louisiana, and were ignorant at the time of the institution of the first suit that the Citizens' Bank was the owner of any of the negotiable certificates or receipts which had been issued by petitioners to the owners of bonds who had placed the same on deposit with them as aforesaid; were ignorant that the Bank had thus acquired a beneficial interest in and to any of the bonds so deposited, except that petitioners were informed that the Banking Department of the Citizens' Bank of Louisiana had some right or title in and to the certificates representing 45 of the said bonds.

That petitioners have, since the institution of the suit for funding the bonds, learned that the Banking Department of the Citizens' Bank

is or was the owner of certificates or receipts representing 665 of said bonds, but that petitioners are unable to state the numbers or series of the bonds in which the said Banking Department had a beneficial interest, nor are they able to state whether or not the Bank is still the owner of such certificates.

It is then averred that the fact that any of said bonds belong to the Banking Department of the Bank is wholly unimportant and in no manner affects the obligations of the State in the premises.

As showing this, the familiar history of the rise and career of the Bank is recited.

The main contentions of the petition are:—

That the effect of the legislation of the years 1852 and 1853, together with the Articles of Agreement of 1853, was to constitute the Citizens' Bank of Louisiana either a dual corporation, or as one corporation with two entirely distinct and independent departments, neither of which participated in the profits, nor was bound for the liabilities of the other.

That the legislative acts and the compact formed a contract between the cash stockholders and the State, with agreement upon part of the latter that she would never look to the cash stockholders for payment of the State bonds, and that said Cash Stock Department should conduct a purely banking concern without apprehension arising from the antecedent liabilities of the Bank.

That the State, by its legislative acts aforesaid, did induce many persons, in no manner interested in, nor bound for the obligations of the Citizens' Bank, to subscribe for and pay in full at par shares of the capital stock of the Banking Department of the Bank; that said shares had for forty years been dealt in and passed from hand to hand in the markets as shares in a corporation in no manner bound for the antecedent liabilities of the Bank or its Mortgage Stock Department; and that said legislation, as construed by subsequent Legislatures and by this court, constitutes a contract between the State and the Banking Department of the Citizens' Bank, which is protected from impairment by the provisions of both the Federal Constitution and the State Constitutions.

That the 665 bonds, or the certificates representing the same, pertaining to the Citizens' Bank, were purchased by the Banking Department of the Bank since the year 1880 with funds belonging to the

said Banking Department, wherein the Mortgage Stock Department had no interest whatsover, and which said funds were in no manner liable to or pledged for the payment of the bonds issued by the State to the Citizens' Bank; that the Banking Department, being a legal entity entirely distinct from the Mortgage Stock Department and not responsible for the debts of the latter or of the bank as antecedently existing, the purchase by it of the said bonds or certificates did not extinguish the obligation of the State of Louisiana upon said bonds to said Banking Department by confusion or otherwise, and that the Banking Department is entitled to recover on said bonds in like manner as any other person.

That though the Citizens' Bank was at the inception of the original litigation the owner of the certificates representing 665 bonds, and though said Bank may still own said certificates, yet the same are negotiable in form, and if it should be held that by reason of the ownership of the certificates by the Banking Department they or the bonds they represent have in any manner been affected or extinguished, then the court should compel the production of the said certificates and their cancellation, or otherwise not in any manner impair or affect the rights of petitioners to recover upon the bonds represented by said certificates still outstanding and representing an obligation of petitioners which may not be extinguished save and except contradictorily with the owner of said certificates and upon their cancellation, and that, therefore, the Citizens' Bank should be made a party to the suit.

The prayer of the petition is for citation to the Citizens' Bank as well as to defendants, and for judgment ordering the Board of Liquidation to settle and liquidate the claim of petitioners in accordance with the principles established by this court in its decision handed down in 1891 (43 La. Ann. 738), without omitting from said settlement and liquidation any of the bonds presented by petitioners for funding by reason of the fact that any of the said bonds are held by the Banking Department of the Citizens' Bank.

And, further, that it be adjudged the Mortgage Stock Department of the Bank has no beneficial claims or interest whatever in and to any of the 9,042 bonds tendered by petitioners for funding under the terms of the decree in the former suit; that it be decreed that none of said bonds have been paid or extinguished by confusion, or otherwise; and

that, however, should the court render any decree affecting the validity of the certificates representing the bonds pertaining to the Banking Department of the Citizens' Bank, then that the decree do further compel the production and cancellation of the said certificates.

The Citizens' Bank, made party defendant, appeared as such, and also as intervenor, and answered that the State of Louisiana, liable upon the bonds issued under the Act of 1836 and extant in 1852 and 1853 to an amount approximating $10,000,000.00, payment whereof was secured by mortgage upon the property of the shareholders of the Bank, had an obvious interest in restoring the Bank's charter that had been forfeited in 1842, so that by the application of the capital and assets of the Bank as they then existed (in 1852) and under the administration of an active Bank, the said bonded indebtedness might be discharged and the State freed from its liability therefor; but that it was thought entirely impracticable to effect this result without procuring fresh capital, and this, it was deemed, could not be obtained without the pledge of the complete immunity of the fresh capital from all liability for said bonded indebtedness.

That with this object in view of ultimately freeing itself from the bonded indebtedness, to be attained by restoring the Bank's charter and thereby better assuring the administration and application of its assets and property to the discharge of said indebtedness, the State, by the legislation of 1852 and 1853 (the first *ratified,* and the second specially *authorized,* by Art. 121 of the Constitution of 1852), restored said charter on certain terms and conditions, which the Bank complied with, and authorized the procuring of fresh capital for conducting the future banking business of the bank, and sensible that said capital could not be obtained without the fullest guaranty it should never be implicated in, or in any manner bound, for said bonded indebtedness, the State, through its legislature, authorized and directed the Board of Directors of the Bank to prescribe the terms and conditions on which the fresh capital should be obtained, and to determine the division of the profits thereof, and that these terms and conditions being thus fixed became then and thereafter known as "the compact" or "articles of agreement" under which the future business of the bank was conducted.

That in accordance with this legislation and the compact the Banking Department of the Bank was formed, and its stock in trade con-

sisted of $1,000,000.00 of fresh capital and $500,000.00 in valuation of the available banking assets of the bank as the same existed in 1853—those furnishing the fresh capital being known as the cash stockholders to distinguish them from the original stockholders, and the latter remaining members of what was thereafter known as the Mortgage Stock Department.

That, thus, the legislation and authorized agreements of that period resulted in the two separate and distinct departments of the Bank, one of which only, the Mortgage Stock Department (the original debtor) should be and remain bound for the antecedent bonded indebtedness, but was to be aided by advances and loans of money, when necessary, by the other department, which loans and advances were to be reimbursed.

That the Banking Department thus formed acquired the capacity to conduct and carry on for its own benefit a banking business and to acquire assets and property of its own.

That, again, in the year 1880, a further agreement was entered into between the Banking Department and the mortgage stockholders by which the non-liability of the former for the antecedent bonded indebtedness was reaffirmed, and the State, by Act 79 of 1880, authorized this agreement to be made and itself, in the act, recognized as the only debtor of the bonds the Mortgage Stock Department of the Bank.

That the distinction between the two departments and the consequent non-liability of the Cash or Banking Department for the indebtedness incurred prior to 1853 has been generally accepted by all parties in interest and concerned; that the Cash Department, for its advances to the Mortgage Department, has been at all times, since the legislation and compact of 1853, deemed and treated as a creditor of the Mortgage Department for the loans so made to it; that, still further as illustrating said distinctiveness, the Mortgage Stock Department has received in the past its proportionate share of the profits of the Cash Department, as owner of one-third of the capital supplied to the latter, which share of the profits has been applied to the payment of its (the Mortgage Stock Department's) debts as required by the compact of 1853, and the large payments made since 1853 on the bonded indebtedness have all been made exclusively from and out of the assets of the Mortgage Stock Department aided by advances of the Cash Department, for which it (the latter) became the creditor of the other department,

and all this has been done with no pretense of claim on the part of the State, or any one, of the liability of the Cash Department, or its capital or assets, for said bonded indebtedness.

That at all times since the compact the State has had in the directory of the Bank directors appointed by it, charged with the interest of the State in respect to the payment of the State bonds; that every Legislature for many years following 1853 appointed legislative committees charged with the duty of examining, and who did examine into and take full cognizance of the transactions and business of the Cash Department and of its separate rights and obligations, and with full knowledge on part of the State thus derived the State has fully acquiesced in, ratified and confirmed by its conduct the separation of the two departments of the Bank and the non-liability for the bonded indebtedness of one of these departments.

That on the faith of these things and of the status of affairs described, large amounts of money have been invested in the shares of stock of the Banking Department; that $350,000.00 of additional capital was subscribed for this stock in 1883 and went into the Banking Department, and this department, for its shareholders, on the same faith, has made investments and acquired property and rights of great value.

That the State is now estopped, by reason of the facts stated, from asserting the liability of the Banking Department for the bonded indebtedness, or from disputing the aforesaid separation of the two departments.

That in the exercise of its rights and privileges as a free and independent banking concern the Cash Department of the Bank did, in 1884, with its own funds and as an investment thereof, acquire certificates, negotiable in form, issued by Hope & Co. to depositors of bonds left with them, said certificates representing 665 bonds of the State in the hands of Hope & Co. as custodians thereof—said agency of Hope & Co. being required by reason of the great number of holders of said bonds, as set forth in their petition herein filed.

Then follow averments that the legislation of 1853, the compact made in pursuance thereof, and the other acts and things going to make up the status of the Bank towards the State and the State towards the bank and the faith given to the same upon which rights were acquired, investments made, etc., constitute a contract between the State and the

Cash Department of the Bank and its shareholders, and that said department and its shareholders are entitled to the full enforcement of said contract, and any attempt on part of the State to deny to said Cash Department and its shareholders the right to fund the bonds so acquired as aforesaid on the faith of said contract would be a breach of the same and an impairment of the contract, as against which protection is afforded by the guarantees of the Federal Constitution and the several State Constitutions from and inclusive of the Constitution of the year 1852 to and inclusive of that year 1879, which provisions of the said Constitutions (naming the articles) are especially invoked and pleaded.

The respondent then affirms all the allegations contained in the petition of Hope & Co. and joins in their demand for the funding of the bonds in accordance with the funding act and the decision of this court in the former suit.

The Board of Liquidation first excepted to the demand of Hope & Co. on the ground that the matters therein set up are things adjudged in the former suit, and pleads the judgment therein in bar of the present action.

Further, that Hope & Co. by their own averments are without interest in the matters set up; that they are not the owners of the 665 bonds in question; that the same are property of the Citizens' Bank; and that the agreements made by Hope & Co. with the holders of the bonds deposited with them do not authorize this suit.

For answer to the merits, the Board denies all and singular the allegations of Hope & Co. in so far as the same assert the right to any relief in the premises as set forth.

To the demand of the Citizens' Bank the Board pleads the same exceptions as in the Hope & Co. case, and further that the petition in intervention discloses no cause of action. For answer to the merits, the Board enters a general denial to the allegations which seek to make the State liable in the premises and avers the State is not now and never was a debtor of the Bank.

Further, that the bonds in question are the property of the bank; were issued by the bank, together with other similar bonds, for its sole interest, and for their payment the bank is liable; that the purchase by the bank of the 665 bonds was for a sum much less than their face value, say for about $67,314.20; and that in making said purchase the

bank acted in its own behalf and interest in thus retiring the 665 bonds, amounting to $295,552.60, with interest, and before the maturity of the bonds.

On these issues trial was had, resulting in a judgment of the court a qua rejecting the demand of Hope & Co. and the Citizens' Bank for the funding of the bonds.

In other words, the court held that the Board of Liquidation was justified in refusing to issue consolidated bonds for the $230,999.22, the balance found to be due on the basis of the former decision of this court.

In doing so, the court a qua reached the conclusion that the Banking Department of the Citizens' Bank, acting independently, was without capacity to purchase the bonds of the State and hold the State liable thereon; that the State had conferred no such power or authority on the Banking Department; and that when the bonds were bought with the funds of one of the departments of the bank, the purchase was made by the Citizens' Bank, the bonds became its property and were thereby extinguished and retired.

From this judgment Hope & Co. and the bank prosecute this appeal.

### OPINION.

The exceptions filed by the Board of Liquidation to the petition of Hope & Co. and to the intervention of the Citizens' Bank appear not to have been acted on by the judge a quo. Nor is it considered necessary to enter upon their discussion here. They are not found to have merit and are simply passed by.

The real questions which the case presents are:—(1) Was the Banking Department of the Citizens' Bank a new creation under the Act of 28th of April, 1853, and the compact or articles of association of 26th of July, 1853; (2) did the legislation of 1853 and the compact aforesaid form a new or modified constitution of the bank, in virtue of which the Banking Department was not liable for the antecedent debts of the bank; (3) if the Banking Department was a new creation and not liable for the antecedent debts, was it a department possessed of the privileges of conducting a general banking business, and, in this connection, had it the capacity to purchase as an investment of separate funds, or in current business, the bonds of the State issued in aid of the bank, as any other bank or third person?

The lower court, in arriving at its conclusions, seems to have proceeded upon the idea that this court, in its former decision (43 La. Ann. 738), held that the obligation of the State on the bonds was only that of surety. That interpretation of the decision is erroneous. The opinion prepared by the organ of the court (Mr. Justice Breaux), concurred in by the then Chief Justice, does not so state. While Mr. Justice Watkins, who filed a separate opinion, expressed the view that the obligation of the State was that of surety, he, nevertheless, held the bonds were embraced within the funding scheme and concurred in the decree which became the judgment of the court. Mr. Justice Fenner, while mildly dissenting, expressed the view that the obligation of the State *towards the holders of the bonds* was that of principal.

So that it does not appear a majority of the court held the view the State's obligation was merely that of surety, so far as the holders of the bonds are concerned.

But, however that may be, the matter is of small consequence if it be found that a new department of the bank was created in 1853 and that the same never was or became liable for the antecedent bonded indebtedness. In such case, if it be considered that the State was surety, merely, on the bonds in so far as the bank was concerned, this suretyship, in its operation and effect, would have to be confined to that department of the bank which alone owed the bonds.

The scheme of the Citizens' Bank of Louisiana as originated and created by the Acts of 1833 and 1836 was purely that of a property bank.

The subscribers to its stock gave mortgages on lands and slaves to secure their subscriptions, and on the faith of these mortgages capital was to be borrowed with which to conduct the business of the bank.

While the bank was given in the first act, that of 1833, the character of a quasi-public corporation, in that it undertook to aid certain works of public improvement and certain benefits to the State were stipulated for, there was no loan of the credit of the State to assist in raising its capital.

But it was not found possible to raise the desired capital on the basis as provided by the Act of 1833, and there followed the Act of 1836, which greatly enlarged the public character of the institution, and extended to it the credit of the State through its bonds as a means of raising the capital needed.

As a guaranty of the bonds to be thus emitted by the State, all the securities granted by the Act of 1833 were transferred to the State and to those who should become holders of the bonds.

The object and purpose of the State in thus aiding the bank, was, mainly, to encourage and promote the agricultural interests of the State. This was to be accomplished through loans made on lands and slaves.

The scheme was impracticable. The bank failed to meet the expectations of its promoters and of the public and the State. Disaster upon disaster followed. Wreck and ruin brooded over the institution, and the involvement of the State for the $7,000,000.00 of bonds it had emitted seemed inevitable.

In 1842, by judicial decree, the forfeiture of its charter was declared, and thereupon the State took physical possession of the assets of the bank, and proceeded to administer the same pursuant to an Act of the Legislature approved April 5, 1843.

This possession of the bank and its assets, and the administration thereof by the State, continued until 1853, when the bank and its assets were restored to the control and administration of its directors and stockholders and the forfeiture of the charter released.

This was accomplished through Act 141 of 1852 and Act 246 of 1853.

The first begins with a preamble which recites the State's responsibility for bonds issued in favor of the bank for a sum exceeding $6,000,000.00, together with accruing interest thereon, and that the then condition of the bank was such as to expose the State to loss from the inability of the bank to meet the payment of the bonds and interest should the liquidation of the bank be continued on the system then prevailing.

This system was the State's administration of the bank, and the declaration above was made after eleven years of such administration.

As consideration for the release of the forfeiture of the charter of the bank and its restoration to the stockholders, the act provides that the bank was to restore to the Governor of the State bonds of the State to the amount of $800,000.00 and should raise by contribution from stockholders, independently of its then means, additional assets for at least $800,000.00.

The evidence shows that the $800,000.00 of bonds was restored to the

Governor. This may have been accomplished through the operation of the 5th Section of the Act, which authorized holders of the bonds to exchange bonds for shares of stock.

But the $800,000.00 of additional assets were not contributed. There appears to have been no sufficient inducement offered by the Act for this. Men of money did not see their way safely to make the investment in an institution confessedly insolvent.

The failure, in part at least, of the Act of 1852 induced the Legislature to enact the Act of 1853, referred to.

Something had to be done to extricate the State, if possible, from its financially perilous position in respect to the bonds which, in an evil hour, it had issued in aid of the bank. Something had to be done to advance the successful liquidation of the bank.

If things went on as they had been going, the State would inevitably incur the great loss of having to pay the bonds with accrued and accuring interest.

The alarm of the State over the prospect is attested by the numerous acts to be found on the statute books from 1842 to 1853—all in the direction of extricating the State with as little loss as possible from the dilemma in which it was placed.

If the bank and its assets were turned back into the hands of its stockholders under the terms and conditions that would result in the infusion of new blood into the moribund corporation, if it could be revitalized by the elixir of new capital put into it, if it were made again a going concern as a banking institution, some hope, at least, appeared that the State might realize some relief and its loss on the bonds reduced, minimized, perhaps altogether averted.

The experiment, at least, was worth a trial. Anything were better than the continuance of the then existing status. The administration of the State for a decade had proven bootless of good results, and meanwhile interest on the bonds was falling due and extensions had, and the bonds themselves were hastening to maturity.

But how to induce new capital to enlist in the service of the bank? Aye, that was the question—there the rub! It would not enlist under the old conditions which had led to failure, bankruptcy, forfeiture.

The Act of 1852 prescribed no new conditions and, hence, the failure to induce capital to come in under its terms.

Then came the Act of 1853. It was a new departure. It recognized

the situation and accepted it. It prescribed new conditions. It authorized the Board of Directors chosen under the Act of 1852, seven in number (two of whom were appointed by the Governor on behalf of the State), into whose hands the bank had passed pursuant to the 7th Section of the Act of 1852, to raise one million dollars of fresh capital, the contributors whereof were to be designated as the "cash stockholders" of the bank, and to enable the directors to raise this money the act empowered them to arrange "terms and conditions" with the contributors.

The act was virtually a power of attorney to the Board of Directors. It is not to be regarded merely as an act passed by the State in the exercise of its sovereign law making power. It is also to be viewed as a proposition made by the State as a contracting party having direct pecuniary interests in the affairs of the bank. Under its authority the directors took action.

After three months—months, doubtless, of thought and reflection, of seeing what could be done, of consultation with those in interest, including the mortgage stockholders and representatives of the State, of negotiation with men of money, of advising with counsel, of preparation of papers—the compact of July 26, 1853, was adopted by the Board of Directors.

This compact constituted the articles of association between the mortgage stockholders and the subscribers of the cash stock. It was the execution of the mandate conferred by the Act of 1853 upon the Board of Directors. It prescribed the terms and conditions upon which the million of fresh capital was brought into the bank. It is not seen wherein the directors, in adopting the same, transcended their authority.

The terms and conditions established in the compact were to be, and were, by the very terms of the second section of the Act of 1853, "binding on and between the holders of the cash stock and mortgage stock, respectively." The latter, at the time, were the debtors of the State on the bonds—the former were not; they had not yet come into the bank. Here, then, was an act of the Legislature which authorized its debtors, the holders of the mortgage stock, represented by the Board of Directors, to make terms and conditions upon which cash stockholders with fresh capital, might come in. If these terms and conditions were binding on its debtors, so must they be held binding on the State. There is no escaping this conclusion.

The holders of the mortgage stock *did* make the terms and conditions—one of which was that the subscribers to cash stock should be exempt from liability on the antecedent debt of the Citizens' Bank, practically all of which was represented by the bonds the State had loaned the bank in 1836.

The third section of the Act of 1853 directed that subscriptions to the cash stock should be received after thirty days previous notice of the terms and conditions agreed upon. This meant public notice, and extensive advertisement in the public press of the time was made of the articles of association. This informed every one, including the State, just how, in what way, the Board of Directors had construed and carried into effect the powers granted them in the Act of 1853. Yet no succeeding Legislature—no act of the State—gainsaid that those powers had been exceeded, or asserted that what was done and said in the compact was not binding on the State.

On the contrary, in legislation thereafter enacted the validity and binding force of the compact was recognized, as it was, too, by this court, following its execution.

The compact divided the capital of the bank into two distinct and separate funds, one denominated the "Banking Department," which was to constitute what was called "the movement of the Bank"; the other the "Mortgage Stock Department," which should "represent its dead weight"; and it was prescribed that all loans, discounts, or other banking operations should be carried on with the capital composing the Banking Department, and for its exclusive benefit and at its risk.

Of what the Mortgage Stock Department should consist was prescribed, and this, it was directed, should *remain* exclusively appropriated to the redemption of the *then* existing liabilities of the bank.

Separate books and accounts of the two departments were to be kept. No funds arising from collections of the mortgage stock department were ever to be used for the benefit of the banking department. Should advances of cash be required at any time by the mortgage stock department to meet the foreign debt (meaning the bonds and interest on same held abroad), the banking department should make the same, either by discounting such securities as the mortgage stock department had to offer, or by debiting such advances to the mortgage department at the usual rate of discount, *the same to be reimbursed out of the first moneys collected by the mortgage department;* and no portion of

the capital of the banking department was ever to be diverted from its legitimate operations except for that purpose—"it being the true intent and meaning of this compact or agreement," declares its VI Article, "that the cash stockholders shall only be held responsible for the liabilities of the banking department."

The dividends accruing to the holders of the cash stock were to be paid them in cash, and the dividends accruing to the mortgage stock department, from that part of the capital of the banking department which the former had supplied, were to be carried to the credit of that department and applied to the payment of its liabilities, or reinvested for its account. The cash subscribers never consented to put their money into the stock of the Banking Department except upon the terms and conditions proposed to them by the Board, acting under authority of the State.

These are some of the salient features of the compact of July 1853, showing the complete separation of the banking department from the other department. The latter was the old bank continued; the former was its new feature, constituting a separate legal entity. It was either another department added to the pre-existing corporation, but complete and distinct in itself and not weighted down with the antecedent burdens of the corporation; or else the Act of 1853 and the compact carrying the same into execution are to be read into the original charter of the bank, adopted in 1833, the three forming, virtually, a new constitution and a dual corporation, one branch of which was the obligor of the State for the credit that the State had extended by the emission of its bonds in 1836, the other not the debtor of the State on account of the bonds, and given a free-hand to conduct banking operations proper. This dual corporation may be likened to twins—separate personalities, but aids and allies one of the other, and the relations of these two departments, which thus sprung into existence, to each other are precisely the same as if they were distinct and separate corporations.

And that the Banking Department has been of the greatest benefit to the Mortgage Stock Department and its creditor, the State, is abundantly shown:

The evidence establishes that during the period from 1853 to 1880 the Banking Department paid to the Mortgage Stock Department, in dividends alone, on the half million of stock held by the latter department in the former, $1,065,000.00, which was applied in payment of the interest on the bonds of the State.

This amount would, doubtless, have been much larger but for the civil war and its resulting demoralization of business and destruction of values, both in landed property and slaves.

In addition to the $1,065,000.00 so paid as profits to the Mortgage Stock Department, the Banking Department advanced its sister department the further sum of $682,000.00, which was applied to the bonded indebtedness, and which was, under the terms of the compact of 1853, to be reimbursed.

With reference to this $682,000.00, while an adjustment was made of this indebtedness in 1880 in an agreement between the bondholders and the Banking Department, by which the latter was to take in discharge of the debt due it the $500,000.00 of the stock held in the Banking Department by the Mortgage Stock Department (upon which it, the Banking Department, had a pledge for all advances made), this court, in its former opinion, virtually canceled this transfer by crediting on the bonds outstanding the estimated value (three hundred thousand dollars) of the $500,000.00 of banking assets which in 1853 the Mortgage Stock Department had transferred to the Banking Department, and for which it held stock in the latter upon which dividends of $1,065,000.00 had been paid.

And, as showing further benefits resulting to the Mortgage Stock Department and the State by the re-organization of the bank which took place under the Act of 1853 and the compact of that year, it only need be observed that whereas in 1853 there was outstanding of the bonds of the State, issued in aid of the bank, something over $6,000,-000.00, principal of the indebtedness, when the former suit against the defendant Board of Liquidation was filed in 1890 there was outstanding of the principal of these same bonds but a little over $4,000,000.00. There had, therefore, been paid or retired two million dollars of the principal of the debt, and the interest had been paid down to the year 1868.   All this had been done by the Mortgage Stock Department of the bank—the State not supplying a dollar for the purpose.

More than this.   This court, in the former case, found that since 1880 funds available from the Mortgage Stock Department of the bank had accrued applicable to the bonded indebtedness, which had not been credited upon same at the time that suit was filed, and that the State, in further diminution of the debt, was entitled to various other credits resulting from assets of the Mortgage Stock Department held

to be available for the purpose, all enumerated in the opinion of the court, the aggregate of which, when applied to the extinguishment *pro. tanto* of the bonded indebtedness sought to be funded, left due *to be funded,* after deducting the discount provided for by the funding act, the comparatively small sum of $230,999.22.

It thus appears that as the outcome of the reorganization of the bank under the Act of 1853 and the compact of that year, resulting in the creation of the Banking Department and the management of the affairs of the bank by that department, the indebtedness of the State on her bonds issued in aid of the bank had been reduced from $6,000,000.00 in 1853 *to a fundable balance of* only $230,999.22, in 1891, which amount, it was stated in argument at the bar and as appears in the briefs filed on behalf of the plaintiffs and intervenor, if funded, *would be all that was left of liability on part of the State growing out of her issuance in* 1836 *of the* $7,000,000.00 *of bonds in aid of the bank.*

It appears from the evidence that persons not previously shareholders contributed the $1,000,000.00 of fresh capital in 1853, and $350,000.00 more in 1883, and that this capital has at all times been represented by shares of one hundred dollars each extant in the hands of holders.

It further appears that since 1853 these cash shares have been leading securities upon the stock market, traded in and bought and sold promiscuously as stock of the Banking Department, and treated and understood by the public as exempt from liability for the bonds of the State issued under the Act of 1836.

The position of counsel for the State that the Act of 1853 intended that only the then mortgage stockholders should subscribe the fresh capital of one million dollars needed to enable the bank to resume business, is not sustainable. We find nothing in the act prohibiting others from subscribing. The then existing stockholders were only intended to be given preference, and if they failed to subscribe, others were not barred.

What was wanted was the fresh capital, and this was to be had by setting apart so many of the existing outstanding shares and selling same to those who would buy. It was never the intention that the scheme was to fall through should the then shareholders fail or refuse to subscribe the amount needed in cash. And that seems to have been the interpretation put upon the act at the time, both by those interested

in the bank and by this court. See Pollock vs. Bank, 12 La. Ann. 230.
· But, in this scheme, the rights of the State, as creditor of the
Mortgage Stock Department in respect to the bonds issued, were safe-
guarded, for it was provided in the act that the mortgages then existing
to secure the stock set apart for the sale, in order to obtain the $1,000,-
000.00, should not be considered raised. This precaution was taken
because of the fact that all the then existing mortgages were pledged
to the State to secure the payment of its bonds.

Here was a double advantage to the State. Its debtors, the mortgage
stockholders, were to contribute shares of stock held by them to be
sold, or subscribed to, to raise the million dollars needed to put the
bank on its legs again, so that it could go ahead in the work of paying
off the bonded debt owed by the Mortgage Department; yet the mort-
gages which had been previously given to secure these very shares
so set apart or contributed were not to be considered raised, but were
to still exist and eventually to be paid by the mortgagors, and when
paid the proceeds to go in extinguishment of the indebtedness for
which the State was liable.

If a stockholder owned fifteen shares, one share was to be set apart
to be sold to raise the fresh capital. For this one share so taken from
him and set apart, he was not only to get nothing (unless he put up
the cash for it himself), but the mortgage he had given to secure the
fifteen shares was to still exist and be exigible for the full amount
represented by the fifteen shares.

It is difficult to see where advantage to the mortgage stockholders in
this agreement appeared, other than that, perhaps, the foreclosure of
the mortgages given to secure payment of their stock was averted, and
the bank in which they were interested was made again a *going* con-
cern; but the advantage resulting to the State is quite apparent.

In the early part of 1857 the case of Pollock vs. Bank, *supra,* came
before the court. It involved the construction of the Acts of 1852 and
1853 relating to the Citizens' Bank. It was a time when this legislation
was fresh in the minds of every one. The decision was by judges sitting
just following the enactments. Their view of the acts was, practically,
the contemporaneous construction, and being such is entitled to the
greatest weight. *Contemporanea expositio est optima et fortissima in
lege.* A statute is best explained by following the construction put
upon it by judges who lived at the time it was made.

In that case the court declared it was notorious the State was largely interested in the success of the bank, being bound for the payment of upwards of $6,000,000.00 of bonds negotiated for the benefit of the bank, and that the avowed object of the legislation was the assurance of the State against loss.

But, further and more important to this discussion are the declarations of the court that the corporation (the bank) "as we now find it," says the court, is the offspring of the legislation of 1853 (Act 246) and that the act made a radical change in the constitution of the bank.

Then, after referring to the several sections of the act and giving a synopsis of their contents, and after showing that the act had been formally accepted by a majority in number and amount of the stockholders, as was required, the court go on to say:

After the acceptance of the act, which was then by its terms in force, the Board of Directors, as they were authorized and required to do by the second section, fixed, on the 26th of July, 1853, before opening books of subscription, the terms and conditions of a compact and agreement as to the manner of administering the affairs of the bank and dividing its profits between the cash stockholders and the mortgage stockholders; which compact and agreement * * * was advertised during the term of thirty days, in six different newspapers, *as the basis of subscription* to the cash stock. The whole of the ten thousand shares of cash stock was thereafter subscribed, *and the bank went into operation under the amended charter of the 28th of April, 1853, and in the mode and upon the terms and conditions fixed by the articles of compact and agreement of the 26th of July, 1853, adopted in conformity and obedience to that statute and which are to be considered as the constitution of the corporation at the present time.* (Italics ours.)

There is here not only a judicial recognition and declaration that the compact of July 1853 was fully authorized by the Act of April 28, 1853, but that it was adopted *in obedience* to that legislation. In short, that it was, as it were, a supplement to the act and *necessary* to carry the purpose of the act into execution.

But more than that, it was a judicial declaration that the compact furnished the basis of subscription to the cash stock, and that the bank thereupon went into operation under practically a new charter and upon the terms and conditions fixed by the compact, and that this compact was, therefore, to be considered "as the constitution of the corporation." These are the very words of the opinion.

Everything, then, found in the compact had the sanction of law.

It and the act of the Legislature upon which it was based formed the new consititution of the bank. This constitution expressly exempted from liability on the antecedent debt. represented by the bonds of the State the new Banking Department created by the compact.

After the court, in the Pollock case, refused to compel the bank to make loans to the mortgage stockholders on their mortgage stock according to the terms of the original charter, the Legislature passed the Act of the 17th of March, 1858, authorizing the Citizens' Bank to extend the time for payment of $500,000.00 of the State bonds, and to use that sum in loans on stock to such stockholders as had not obtained the loan to which they were entitled under the bank's original charter; and, as additional guaranty to the holders of such bonds so extended, the act provides:—

That any sum or sums which the Board of Directors may have already carried or shall hereafter carry to the credit of the "reserve fund" of the banking department of said Citizens' Bank *under the compact of 26th July, 1853,* between the cash and mortgage stockholders shall not be distributed until the $500,000.00 of bonds extended as aforesaid shall have been paid. (Italics ours.)

Here, then, was direct legislative recognition of the new Banking Department of the Bank *and of the compact.* Not only that, but in the act the State stipulated for herself a distinct benefit—that the sums carried to the credit of the "Reserve Fund" of the Banking Department shall not be distributed until the $500,000.00 of bonds, to be extended under the provisions of the act, shall be paid.

In this the State demanded and accepted, and the cash stockholders made, the sacrifice for the benefit of the mortgage stockholders and the State. The latter will not be heard now to allege that this demand was wholly unnecessary; that not only the assets of the reserve fund, but all other assets of the banking department, were already pledged to her. If all were pledged already, why stipulate for a special pledge of a part only?

The duality of the bank is further recognized by the State in Act 45 of 1875. That Act directed the Board of Directors *to call on the Mortgage Stockholders* for such contributions *on their stock* as was necessary to assure the prompt payment of the interest on the bonds of the State. There was no claiming, or hinting at, any liability of the *cash stock* for such contribution.

The inference is irresistible that the State, at that period, did not consider the banking department was responsible for this debt, and, further, it shows that there was then no question of the separate, independent character of the banking department apart from the Mortgage Stock Department.

Act 79 of 1880 equally recognized the separations of the "Mortgage Stock Department" and the "Banking Department," and equally indicates the accepted general understanding that the debts of the old mortgage bank were a liability alone of the Mortgage Stock Department.

And this court, in its former opinion in 1891, in the case of these plaintiffs against the Board of Liquidation, in effect held that it was only the Mortgage Stock Department of the bank that was responsible to the State on this bonded indebtedness.

This is indubitably and conclusively shown by the fact that the decree of the court in that case, in enumerating and adjudging the credits to be applied in diminution of the indebtedness, delivered over to plaintiffs the whole of the Mortgage Stock Department as assets available for that purpose, compelling them to take the same and apply the aggregate value thereof to the indebtedness, *but did not advert to as applicable to the debt, or touch or adjudge as in any way responsible for the same or any part thereof, the Banking Department or any of its assets.*

As that was a suit to test the liability of the State on the bonds as fundable assets in the hands of the holders thereof, and as the State, in resisting the funding of the bonds, sought, along with its other defenses, to minimize the fundable amount thereof in case it should be held the bonds were of that class of public liabilities included in the funding scheme, every effort was made on behalf of the State to marshal every possible asset legally available as credits to which she was, or should be, entitled, so as to set-off entirely the whole indebtedness, if possible, or, at least, to let the State out with as small a balance due as possible.

And yet the court, marshaling all possible assets of the bank *legally available as credits, did not touch an asset of the Banking Department.* This is emphasized in the concurring opinion of Mr. Justice Watkins —that one of the Justices whose concurrence in the decree was requisite to form the judgment of the court—as a few references will show.

On pages 766 and 767, 43 La. Ann., he said:—

It appears that by an Act of the Legislature, there was a change

made in the charter of the Citizens' Bank in 1853, whereby a banking department was added to the theretofore property bank, and fresh capital in money was subscribed—it being the legislative intention and purpose that these two departments should act separately and independently of each other. Hence, since the banking department was established under the law of 1853, it has done a legitimate banking business, while the property bank, or as it is familiarly termed, the mortgage stock department, has pursued its particular branch of business—though virtually engaged in a liquidation of its affairs and endeavoring to realize on its assets. While this division of the bank into two departments is doubted and denied by the defendant * * * yet the compromise of 1880 (pursuant to the legislation of that year—Act 79) proceeded on that theory and the State apparently acquiesced in that condition of things.

In fact, I fail to see the impropriety or impracticability of such an arrangement. It is an established fact that, on the faith of the legislative authority (meaning the Act of 1853) $1,000,000.00 of *fresh money capital* was subscribed and actually paid into the new banking department; and it could not be supposed that this would have been done if the subscribers had believed that their assets would, in any event, have become liable for the large claims of the plaintiffs.

He goes on to say that while by this arrangement the Legislature did not charter a *new* bank, it did permit the organization and equipment of *a banking department per se,* as an addition to the existing *property bank,* by the subscription of a specified amount of fresh capital—the stockholders in the property bank being accorded *a preference* in taking stock in the new department, to a limited extent.

"In my opinion," he continues, "the obligations of the property, or mortgage department of the bank were unaltered or unaffected thereby—neither were they diminished or increased—*and the banking department never incurred any liability to the plaintiff* and never acquired any interest in, or right to, the assets of the mortgage department." (Italics his.)

If the banking department never incurred any liability to the plaintiffs, neither did it to the State, for it was only *as holders of the State's bonds* that plaintiffs could have asserted any liability against that department.

The compact of 1853 expressly provided for the existence of the relation of debtor and creditor between the Banking Department and the Mortgage Stock Department, and that relation could not exist if confusion was to take place simultaneously with the birth of the obligation from one department to the other.

The bonds which the Banking Department bought and paid for as an investment of its separate funds were not evidences of any debt due by it.

While the price paid for the bonds was much less than their face value, it is not pretended it was not their full market value at the time. The purchase was made in 1883, after the funding law was passed and when the fundability of the bonds was in dispute.

Besides, if the Banking Department had the right to buy and own the bonds, it had the right to buy them at the lowest price at which it could get them. The purchase was made for its own account; not for that of the Mortgage Department, nor was the price paid as an "advance" to the Mortgage Department. No such "advance" was required, or could have been required, under any construction because the bonds were not due.

If the bonds had been decreed to be not fundable, they would have been "nothing worth" and the loss would have fallen entirely on the Banking Department.

The State has not been injured. If the purchase had not been made the bonds would have remained outstanding in the hands of others and been asserted by such others as fundable obligations of the State.

It all comes back to the same question—was the banking department a debtor of the bonds?

If not, it was entitled to buy and own them with the same rights as any other holder.

Suppose the holders of the State's bonds, upon their own initiation, or at the instigation of the State, had, after the creation of the Banking Department, foreclosed the mortgages given by the Mortgage Stockholders to secure payment of the shares they had subscribed to, which mortgages were held in pledge for payment of the bonds, and by these proceedings the Mortgage Stock Department had been wiped out (for the foreclosure of all the mortgages would have had that effect), would the termination, thus, of the existence of the Mortgage Stock Department have had the effect of destroying, too, the Banking Department of the bank? This question must be answered in the negative. The Banking Department would have continued on.

If this be so, and after the disappearance of the Mortgage Stock Department, the Banking Department had purchased the bonds in question, would it be seriously urged that such purchase had extinguished the bonds by confusion? We think not.

The conclusion is unavoidable (1) that the Banking Department of the Citizens' Bank was a new creation under the Act of 1853 and the compact or articles of association of that year, adopted in pursuance of the Act; and (2) that the legislation of 1853 and the compact formed a new constitution of the bank, in virtue of which the Banking Department never became liable for the bonded indebtedness of the State incurred in 1836 in aid of the bank.

Being a new creation for the purpose of conducting a general banking business, and not being liable for the bonds of the State, it follows that the Banking Department had the capacity to purchase as an investment of separate funds, or in current business, the bonds in question, just as any other bank or third person could do.

This being so, the purchase did not extinguish the bonds by confusion, and the Banking Department is entitled to recover upon the bonds or the certificates representing the same, and entitled to the benefits of the funding scheme in reference thereto, in like manner as any other person could or would.

We do not find there was any privity between the Banking Department and the State—any relation of agency on part of the former towards the latter—which precludes the Banking Department from recovering from the State anything more than the sum, with interest, which it paid for the bonds.

The compact makes it perfectly clear that, *in its administration of the Banking Department,* the Board of Directors of the bank acted as exclusive agents and for the exclusive benefit of the cash stockholders, subject only to the agreement to make advances to the Mortgage Department when required, and on proper security, to aid it in meeting its debts, which agreement had no reference to, or connection with, the purchase of the bonds.

Besides, it is by no means clear that if the course were adopted of holding the State only for the purchase price of the bonds, with interest from date of purchase, the State would be the gainer. There is much basis for a calculation which would show a different result, while if the whole case were reopened for a recasting of the accounts it appears certain the final outcome would be still more burthensome—largely so—to the State.

It is time to put an end to this night-mare of financial folly which for two generations has disturbed the repose of the State. The courts have been wrestling with the complicated issues and difficult calculations

involved in this controversy for many years. They have been so complicated and difficult that judges have been hopelessly divided as to their solution.

The final decree rendered by this court in the former case, from every point of view, did full justice to the State, and we do not see our way to sustaining the present claim of the State to have its execution modified or disturbed in any respect.

Fortunate, indeed, is the State to emerge from this entanglement, this labyrinthine involvement, with only the loss of the comparatively paltry sum which the former judgment of this court shows it is responsible for.

In the beginning, seven millions of indebtedness, principal, and other millions of interest to accrue; in the end less than a quarter of a million, principal!

For the reasons assigned, it is ordered that the judgment appealed from be annulled, avoided and reversed, and it is now adjudged and decreed that the Board of Liquidation do settle and liquidate the claim of petitioners in accordance with the principles established and the directions given by the court in its decision in cause No. 10,830 on its docket, and as of the date when the bonds should have been funded, viz:—October 27, 1891, and without omitting from said settlement and liquidation any of the bonds presented by petitioners for funding by reason of the fact that certain of the bonds are held by the Banking Department of the Citizens' Bank of Louisiana.

It is further ordered, etc., that on the delivery by the Board of Liquidation to petitioners of consolidated bonds of the State of Louisiana for the balance shown to be due under the former decision of this court, to-wit:—two hundred and thirty thousand, nine hundred and ninety-nine and 22-100 dollars, with interest coupons attached from the 27th day of October 1891, petitioners (Hope & Co.) are to deliver to the Board of Liquidation for cancellation all the outstanding bonds tendered by them for funding, viz:—9042 bonds, amounting, in the aggregate, to the sum of four million and eighteen thousand, six hundred and twenty-six and 48-100 dollars.

It is further ordered, etc., that all the costs of both courts be paid by defendants.

NICHOLLS, C. J., recused.

BREAUX, J., dissents for reasons assigned.

Rehearing refused.

(BREAUX, J., adheres to his original dissent.)